MR. DOYLE:  That's right, Your Honor, at the present time we do not intend so. [Tr. 39-40].

THE COURT:  Colleagues, I have divided these exhibits here into three piles.  One, those that are admissible, those that I want to ask you some questions about, Mr. Tibbetts, and then there's a group that are not admissible.  Now, with respect to the admissible documents, the great bulk of these are documents that are signed by representatives of Yale University or specific parties to the action.

MR. DOYLE:  If Your Honor please, there's no evidence of that.  I don't think you can take judicial notice of it.  They're not self-authenticating.  [42].

------------
MR. DOYLE:  I'm sorry, Your Honor, I don't have a copy of these.  Doesn't mean anything to me.  I don't know how to respond. . . .  Will I have an opportunity to address the Court with respect to each one, on my objections to their admissibililty?

THE COURT:  No, I think that you better state your objections now, sir.

MR. DOYLE:  Well, it's hard for me to state my objections when I don't know which documents you're saying are going to be admitted.  I can't do that in a vacuum. . . .

THE COURT:  Sir, did I not request that you sit down with this gentlemen and review his documents to see where you could agree, and Mr. Tibbetts, did you produce them and offer them to Mr. Doyle?

MR. TIBBETTS:  Yes, I did, Your Honor.  You should have them in front of you.

MR. DOYLE:   And I don't contest that.  That's different from my being given – we didn't agree, and I'll be happy to tell you why we didn't agree. . . . First of all, in order for a document to be admitted into evidence, there has to be proof of its authenticity, proof that it's competent, and proof that its relevant.  Now, in normal circumstances lawyers obviously don't expect other parties to go through every evidentiary hoop when it's clear in the circumstances that those evidentiary hoops can be overcome.

But I object to Your Honor sending the case to the jury, as you know.  I object, number one, that there is no evidence for Mr. Tibbetts before the jury.  There was no proof that the statements he was making, which is required by the rule based on personal knowledge.  He was just asked to get up there and tell the jury what he wanted them to hear, which is not appropriate.

Secondly, to the extent that my – and I object to documents simply going into evidence and being dumped on the jury, not a context, simply dumped on them with no evidence about those documents, no evidence surrounding them.  And to the extent that my consent is necessary to do that, then I withhold my consent, because I think it's inappropriate.

If we're just going to dump these documents on the jury, they're going to be left to speculate about totally apart from the question of admissibility, they're not in context, and that's not the way it should happen.

And that's why I did not agree to any of them going into evidence. And I do insist that I am entitled to an opportunity to address the Court on objections that I have to each one. [44-45].

### I (7)    Defendants Argue the "Self-Authenticating" Grounds is Inconsistent

THE COURT: Now, I've got a large pile of documents that the Court has examined and has determined are not admissible. They seem to fall into a couple of categories, either, one, they're your own statements, Mr. Tibbetts, which would simply constitute a perpetuation of your testimony before the jury, and are therefore not admissible, or they constitute statements from other people, which under the rules concerning hearsay would make them not admissible. There's several hundred of them.

What I would do is I would return them to you, and I'll hear you on these with respect to any that you claim are admissible under some rule that I have overlooked. . . .

MR. DOYLE: Your Honor, please, I haven't made a count, but seems to me that you have ruled over a hundred, at least over a hundred exhibits, that you deem without any evidence at all are admissible, and I cannot possibly respond after a few minutes. You said a few minutes. . . . [52-53].

--------------------

THE COURT: Attorney Doyle, did you have a chance to review those proposed offers?

MR. DOYLE: . . . . I'll have something to say about some of the specific ones, but there seems to be a theme that runs through. If it's on Yale stationery, and it was produced in discovery, Your Honor, I take it, is concluding that it therefore –

THE COURT: If it was signed by somebody, that's generally true.

MR. DOYLE: But that's self-authenticating, in other words.

THE COURT: That's what has –

MR. DOYLE: I don't agree with that, and I object to that.   That's not self-authenticating. [53-54].

--------------------

MR. DOYLE: . . . . Now, for the life of me I don't know what these are relevant to, *and the problem of these coming in, just being dumped on the jury, without a context, without any explanation of what this is about, and how it bears on anything, just leave the jury to speculate as to the circumstances under which it was written and why, to speculate about it.*

THE COURT:  I thought the reason that I had considered them relevant was that he testified in his direct examination that some representative from Yale had circulated a claim that he had an arrest record and that he testified that he had gone through efforts to prove that this was not the case, and that's why I thought it was relevant, because it tended corroborate his statement.

MR. DOYLE:  *Well, I don't think it's relevant.*  I don't think his statement, which is just a statement, is competent evidence for the reasons I gave before, Your Honor.  He didn't say who he was, how he knew, whether someone told him, that someone told him that, did not establish that he was in a position to have personal knowledge.

An example of that, if somebody tells me, do you know that James Dittes told Joe Blow that you did this or that, any I got up there on the stand, without any foundation, and say James Dittes defamed me, that's not – that's a conclusion.  There isn't a foundation to establish, as the rules of evidence require, that he was in a position to have personal knowledge, or that his statement is based on hearsay from somebody else, and a foundation hasn't been laid, and that's what I objected to him just sort of telling his story.  So I object.  [57-58]

-------------

MR. DOYLE:  [Document] 303.1, again, *there's nothing on it to – it's not on any stationery, and there's nothing – it's not signed by anybody.*  It purports to be a memo from Dwayne Huebner to James Dittes, but there's nothing to establish that it is.

The same thing – I may have gotten out of sequence here.  Actually as I'm looking through these, these are the ones that they seem to have a similar pattern, Your Honor.  *They're not on Yale stationery, and they're not signed by anybody.*

THE COURT:  But they seem to be going from one party to another party.

MR. DOYLE:  *Well, we don't know that.*  That's another problem with letting documents go in out of context.  We have no idea whether these were sent or not sent.  There's an assumption you can make, but there's no evidence to support that.

THE COURT:  They do purport to be from one party to another party, one Defendant to another Defendant.

MR. DOYLE:  *No, not all these people are Defendants.*  Very few individuals are Defendants.  Which raises another issue.  What may be an admission with respect to Yale University is not necessarily an admission with respect to James Dittes or Penelope Laurens or the other few.  There are only a few Defendants, because he didn't serve everybody.  The ones who appeared are only the ones who were served.  *So again, that's a problem of just dumping exhibits in front of the jury, not in a context.*

I apologize, Your Honor, I may have got these a little out of order, but these documents I object to – let me go through the whole bunch – that there's nothing to

authenticate it.  *Other than, well, that are not self-authenticating, they're not signed by anybody.*  [60-61].

### I (8)                The Court Excludes Those Documents with Plaintiff's Handwriting

THE COURT:   All right.  Mr. Tibbetts, now with respect to the pile.

MR. DOYLE:    Before we get to that, a mechanical matter.  That none of these have been marked with court exhibit stickers, and . . . . *I'm just wondering, I don't want a problem if we end up in the Second Circuit,* . . . I, you know, maybe we should have marked them first, for identification, but as long as we agree that – I mean there is an identification number.   It's not the Court's number.

THE COURT:   What we can do is put the official exhibit number or sticker on them in such fashion that the numerology that was on them remains, and with respect to those, why don't you cover up . . . those for the purpose of the file. . . . There's one other matter, I'm not sure we covered it, and it's this:  that there are two documents that are the same [number] . . .  except that—did we deal with that?

MR. DOYLE:  That has Mr. Tibbetts *handwriting* on it.

THE COURT:  . . . .232 will become the exhibit.

MR. DOYLE:  Yes, 232 is identical.  *Without the writing.*

THE COURT:  Okay.

MR. TIBBETTS:  *So you're saying, Your Honor, that my handwriting isn't relevant here*?

THE COURT:  I guess the way to most simply explain the question of many of the documents that you have that were excluded from evidence is because they're your statements, your letters, and you propose to have those admitted as evidence . . . . This is basically why.  So many of the exhibits that you have in which you, in essence, not in essence, you actually perpetuate your story.

MR. TIBBETTS:  *It goes to state of mind, Your Honor.*

### I (9)        Plaintiff Demands a "Mistrial" Because the Court Has Excluded 90% of  the University's Records Which Plaintiff Needed to Establish His Claims

MR. TIBBETTS:  Your Honor, . . . .  I've got documents in here that are my records that need to go before the jury.  I can authenticate every one of them.  What is going before the jury right now is every document from Yale University.  How can that possibly establish my case?  Your Honor, I want counsel.  I demand counsel here.  I have been demanding counsel all day long.   I will not go forward with this anymore.  I demand an immediate mistrial on this.  [65]

THE COURT:  . . . . Sir, the second thing that has been objected to here is the letters of reference. There's a series of them.  Did you put those in a separate pile, sir?

MR. TIBBETTS:  . . . . Well, Your Honor, *correct me if I'm wrong, but this is a case about defamation, about my reputation.*

THE COURT:  Right

MR. TIBBETTS:  You're asking about relevance.  What we're trying to establish here, and what could have been established if counsel had been able to make the arguments, and if we had allowed the depositions to have gone forward so that a reasonable trial could have happened here, *was to be able to establish what my reputation was prior to Defendant Dittes' allegations.*

THE COURT:   So it's your claim that the relevance of these [documents] is that it serves to establish your reputation in the religious community, or the Yale community.

MR. TIBBETTS:  *Absolutely.   Reputation is everything in a defamation case.*

MR. DOYLE:   Well, Your Honor, if that's the purpose of the offer, they're being offered for the truth of the content, and by people who aren't defendants in this lawsuit, and by people who have no connection, that are not involved in the events that take place here, and they're hearsay. . . . [And] I have a problem with all of that.  I said they may be public documents, some of them, because other than just a letter, certified, and appears to be on an official form.   But my objection is not only to authenticity, but also to relevance, and also misleading.  You dump these in the jury, what are they supposed to make of it?  It leads to all kinds of speculation.  Who's checking his records and why?  Is someone stirring up trouble?  Who knows?  Which is the problem with dumping documents not in context.  [Tr. 67].

MR. TIBBETTS:   Your Honor, those would be part of the context if we had – had I had the opportunity to lay a foundation for them.   These were allegations made to the Presbyterian Church. . . . And this was part of the record of the Presbyterian Church that I had to refute, *all of which has been excluded.*

THE COURT:   The objections to these five are overruled.  [Tr. 67-68].
-------------------
THE COURT:   Let me ask you this:   Was there with respect to any of the exhibits that you submitted, that the Court excluded, was there any of them that having looked at them again that you wanted to comment further on sir?   Just as Mr. Doyle did?

MR. TIBBETTS:  Yes, Your Honor, there are.

THE COURT:  Sure, let's go ahead.

MR. TIBBETTS:  *Your Honor, there are no documents that demonstrate my contact with the U.S. Navy, no documents that demonstrate my contract with the Presbyterian Church, and no documents demonstrating my contract with the Beijing Foreign Affairs College.  Those all have been excluded.*

*All of the internal documents, or most of the internal documents by YDS professors that were not on letterhead have been excluded.  All of the letters and the documents surrounding my resignation from the U.S. Navy Reserve, from the Presbyterian Church, and my withdrawal from the Beijing Foreign Affairs College have been excluded.*

*All of the records relating to the U.S. Attorney's Office from Connecticut, the U.S. Attorneys' Office from Virginia, from the postal service, establishing that crimes were alleged, have been excluded.*

*All of my letters to Yale have been excluded, related to the pending charges that I would – that I was dealing with at the time.  All underlying documents of the hearing itself were excluded.*

In the other cases that we have pending before this court before . . . . Judge Thompson, we deal with the element of constructive fraud.  How can that be alleged if those documents can't be submitted to the jury?

What happened was that the general counsel's office has said that I could submit all of my exculpatory evidence from expert witnesses and from all of the people that had verified or corroborated that these essays were mailed.  All of those were withheld from the Professional Studies Committee.  They're also being withheld from the jury.  That is an important element that should be in this complaint that I have asked to have amended.  All of my medical and psychological records have been excluded.   And all of the documents and analysis of the questioned document examiners have been excluded.

*Based upon what I said on the witness stand, there is absolutely nothing in the record to corroborate one thing that I have said, not one thing.  Everything that is going before the jury has a stamp of Yale University on it.* . . . As it stands right now, 112 documents of Yale University are being submitted, and some of them public records, which have no foundation whatsoever other than the fact that I said on the witness stand that Professor Dittes had charged me or at least had told the Presbyterian Church that I was a fugitive from the law.

Not one of the things that's going to the jury will support one thing that I am bringing before this Court right now.  There has been no testimony from any of my witnesses.  I have asked for a continuance on that.   I have asked for counsel to present this evidence.  There's been no cross-examination.  There's been no direct witnesses.  Yale University hasn't produced one witness here today. . . .  All I'm asking for is a fair trial to have counsel try this. . . .  *This is nothing but a railroad job, Your Honor.* [Tr. 75-77]

93.    The trial evidence that the court admitted is attached hereto and incorporated herein as Plaintiff's Admitted Evidence 0001-0142.   The evidence which the court *excluded* is attached hereto and incorporated herein as Plaintiff's Suppressed Evidence 0001-1164.   Where the total

admissible evidence from the university's records was 1306 documents, and where the court only admitted 142 documents, it is clear therefore that the court excluded 90% of the admissible evidence in this case.

94.     The surprise created in this trial *is a direct result of the court's failure to conduct a pretrial conference.*   The court failed to make any decision regarding the admissibility of evidence until the actual day of trial.   As a result, *neither the prosecution nor the defense knew what evidence would be admitted for trial.*

95.     This failure to conduct a pretrial conference was a violation of the spirit and letter of Rule 16(d) of Federal Rules of Civil Procedure which provides that a "final pretrial conference shall be held as close to the time of trial as reasonable under the circumstances," and that "[t]he participants . . . shall formulate a plan for trial, *including a program for facilitating the admission of evidence."*   F.R.Civ.P. 16(d) (emphasis added).

96.     In summarizing the first day of trial:

(1)     Plaintiff pleaded with the court for a continuance so that his counsel could try the case (Tr. 11-15);

(2)     Plaintiff gave approximately 10-14 minutes of testimony (Tr. 15-24);

(3)     There was evidence of procedural confusion because neither the court nor the parties had heard from the Second Circuit regarding the Writ of Mandamus (Tr. 27);

(4)     Defendants' counsel was adamant in his objection to plaintiff's testimony as being contrary to FRE 602 (Tr. 32-34);

(5)     The court refused to strike plaintiff's testimony (Tr. 35);

(6)     Defendants' demanded a "mistrial" for procedural errors in the case (Tr. 36);

(7)     The court excluded 90% of the university's records because they were not on official university stationery; thus not "self-authenticating"  (Tr. 38-79); and

(8)     Defendants complain about "dumping" documents on the jury without a "context" because it leads to "all kinds of speculation" (Tr. 67.)

(9)    Plaintiff demanded a "mistrial" because the court had arbitrarily slashed all admissible evidence and allowed a "railroad job." (Tr. 75-77).

123.    Based on the above evidence, it is clear that both this Court and the Second Circuit would find substantial "surprise" and "procedural confusion" in the first day of trial that would allow relief from any unjust enforcement of this judgment, pursuant to F.R.Civ.P. 60(b)(1).

## II.    SECOND DAY OF TRIAL

97.    The second day of trial continued the themes of surprise, plaintiff's need for counsel, and lack of evidence and witnesses. The transcript for the second day of trial is attached hereto and incorporated herein ("2 Tr."), and it shows as follows:

98.    The court opened with additional disputes and problems over evidence. 2 Tr. 2-3. The court refused to admit university documents that showed "contracts" between the plaintiff and (1) the Beijing Foreign Affairs College, (2) the Presbyterian Church (USA), and (3) the U.S. Navy. *Id* at 4-7. The court held these documents "in gross" constituted "hearsay"—even though the court did not dispute the *"notion that these may be relevant to the issues here."* 2 Tr. 6:5-6.

99.    Plaintiff wanted a continuance so that his witnesses could testify. He also asked to subpoena the defendants *who had again failed to show for trial*. The court *denied* both motions: "the record simply reflecting that *we're in the midst of the trial*." 2 Tr. 7:22-23.

100.    The court decided for the first time that only two of plaintiff's four claims would be heard by the jury. Plaintiff responded "So as I understand it, then Your Honor, it's defamation and intentional infliction of emotional distress?" 2 Tr. 8-9. The court, "Yes, and I will sit down with you again and review that issue with you." *Id.* 9:2-3.

101.    The court had arbitrarily struck the claims on breach of contract and tortious interference with prospective economic advantage because "there just simply is no evidence" to

support these claims.  2 Tr. 157:16.   Plaintiff pointed out, however, that the reason "there just

simply is no evidence" is because the court excluded 90% of the university's documents, which

included the plaintiff's "contracts" with the (1) the Beijing Foreign Affairs College, (2) the

Presbyterian Church (USA), and (3) the U.S. Navy as "hearsay."   *See* discussion *infra* at 2 Tr. 156-

157; 159-160

102.    The Joint Pretrial Memorandum stated that the trial would last eighteen (18) days.

But once the court excluded all of the evidence and witnesses, the court told the jury that "this trial

is going to I believe come to its conclusion a great deal sooner than was represented to you."  2 Tr.

20-21.

### II (10) <u>Without Any Evidence or Witnesses, Court Rules That Plaintiff has "Rested"</u>

103.    Without the opportunity to corroborate evidence or introduce witnesses, the court

informed the plaintiff that he had "rested":

> THE COURT:    All right, do you have any further evidence other than wanting to address the jury on this issue of damages?

> MR. TIBBETTS:   Your Honor, I would like to be able to introduce expert witnesses to be able to corroborate what I'm saying. . . . I said yesterday that they weren't able to come for this hearing, and that's the reason I asked for a continuance.

> THE COURT:   Do you have anything here?

> MR. TIBBETTS:  I'll be happy to testify on damages as I understand them, the limited damages, in addressing the jury, which would supplement my narrative of yesterday morning.

> MR. DOYLE:   And again, Your Honor, I would object to any narrative.

> THE COURT:  That's overruled.   But then you have nothing further, other than that, here in the courtroom, that you're prepared to introduce in evidence to the jury sir?

> MR. TIBBETTS:  All the other evidence has been reviewed and struck, so I don't have anything additional at this point.

THE COURT: Okay. *So the record may reflect that at this juncture the Plaintiff has rested.* [2 Tr. 9-10:3].

## II (11) <u>Court Allows Plaintiff's Narrative on Damages in Violation of FRE 602</u>

104.    The court agreed that the plaintiff could provide additional "limited" testimony on damages. 2 Tr. 10:10.  However debate quickly ensued with defendants' counsel arguing that plaintiff's narrative testimony, without foundation or evidence, was a "suspen[sion]" of FRE Rule 602.  The transcript captures the surprise created over this continued "suspen[sion]" of FRE 602:

MR. DOYLE:  *I have objected to the narrative.  Your Honor said you're going to let Mr. Tibbetts say something about damages?*

THE COURT: Yes, sir.

MR. DOYLE:  Okay.  I object to the narrative.  And to preserve the record, yesterday you suggested that I might have waived something because I did not object while he was going through – I objected to the narrative – while he was going through the narrative, I think you said, implied, that I had waived any hearsay objection because I hadn't objected.
        I don't want – I mean, *I don't have an opportunity to object unless I'm going to go up and put my hand over his mouth.  Your honor has told him, tell the jury whatever you want to tell them.  And I don't know how in the context I can deal with it other than* –

THE COURT:  To stand up.

MR. DOYLE:  -- a motion to strike when he gets through.

THE COURT:  You stand up, if you perceive that there's something objectionable being said, sir, stand up and object.

105.    Whereupon the jury witnessed defendants' counsel jumping up and down to virtually every statement which the plaintiff made about "damages":

THE COURT:  The record may reflect that our jury has returned to the courtroom.  The Court has authorized Mr. Tibbetts here to make a further statement to you limited to the issue of damages here.  Because he is giving his testimony in a narrative form, there may be objectionable material.  I've instructed Attorney Doyle to object and interrupt, so he's not being rude if he does, he's simply doing what I've told him to do. . . .

MR. TIBBETTS:  . . . . . I'm going to provide supplemental testimony on the damages that I sustained from the various allegations and defamatory statements that the University made about me that affected my ability to be employed.

MR. DOYLE:  Your Honor, *I'm going to object to that and move to strike it.  It's not evidence, it's simply a statement of a claim.*

THE COURT:  It's overruled.  Go ahead.

MR. TIBBETTS:  As I was saying, we all know that charges took lace over a three year period at the University, I was in the process of being ordained while I was at the University in the Presbyterian Church. . . .

MR. DOYLE:  *I'm going to object to that and move to strike, that there's no foundation, no evidence that he's in a personal position to know.*

THE COURT:  He's saying this is what he would do.  It's overruled.

MR. TIBBETTS:  I testified on that yesterday, too, Your Honor.

THE COURT:  Go ahead, sir.

MR. TIBBETTS:  That two years that I was going to teach English in China was not going to be for a lot of money. . . . The loss of the adjunct professorship to the Beijing Foreign Affairs College in U.S. dollars probably would have been equivalent to $14,000.  That was two years.  Those two years in the Presbyterian Church had already agreed would act as my two years under their supervision before I would then go into the Navy.

MR. DOYLE:  Your Honor, I object to that on the grounds it's hearsay, telling the Presbyterian Church would have done.

MR. TIBBETTS:  That's not hearsay, that's what they told me.

MR. DOYLE:  Please, Mr. Tibbetts, that's what they told you.

THE COURT:  *Disregard that*.  That's what the church told you.

MR. TIBBETTS:  And I have documents.

THE COURT:  The objection is sustained.  *Go ahead, finish up, sir.*

MR. TIBBETTS:  I had acquired probably about 70 to $80,000 in student loans by the time I attended Yale University. . . . So I had approximately 70 to $80,000 in student loans that I had anticipated would be deferred when I became a chaplain, and since I

had anticipated serving as a chaplain for 20 years, all of my student loans, or the bulk of them, would been paid off by the government as I was in the process of –

MR. DOYLE:  Your Honor, *I'm move – I object to that on the grounds no foundation that he's in a position to know that, talking about some technical government provisions that, if they exist, should be proven by somebody who has personal knowledge of that.  There's no evidence that he does.*

MR. TIBBETTS:  I have personal knowledge that they exist, Your Honor.

THE COURT:  I'll allow the response.  Go ahead, sir.

MR. TIBBETTS:  *I keep losing my train of thought here*. . . . In addition, I lost my candidacy with the Presbyterian Church because these charges were published to the Presbyterian Church.

MR. DOYLE:  Your Honor, I'm going to object t that on the grounds that that's a conclusion he is drawing, and if he we have somebody here from the Presbyterian Church who would testify as to why they did what or why they didn't do what they did, that would be appropriate testimony, but not his conclusion as to why they did certain things.  Can't be based on anything about hearsay.

THE COURT:  The response stands.  Go ahead, sir.

MR. TIBBETTS:  As a consequence of the charges that took place, I lost my candidacy with the church.

MR. DOYLE:   Your Honor, *I object to that, and I move to strike.  That's a conclusion that the witness –*

MR. TIBBETTS:  That is not a conclusion.

MR. DOYLE:   Please, Mr. Tibbetts, I address my objections to the Judge. . . .

MR. TIBBETTS:    Can I ask for –

THE COURT:   The response stands.  Finish up sir.

MR. TIBBETTS:  I lost my candidacy with the Presbyterian Church.

MR. DOYLE:  *Same objection, same grounds*.

THE COURT:  All right, and its noted.

MR. TIBBETTS:  As a consequence of losing that, I also lost my commission, because the church provides –

MR. DOYLE:  Just a second.  Your Honor, I'm going to object to that on the same grounds, that he's not competent to testify.  He's stating his conclusion as to causation as to why other people did or didn't do certain things, and that can be based only hearsay, if no simply his own perception.

THE COURT:   The response stands.

MR. TIBBETTS:   Thank you, Your Honor.   I resigned my commission in October of 1991.  I haven't been able to get it back.  I haven't been able to get back to the Presbyterian Church.   The damages that I have sustained from the allegations, the defamatory innuendos and charges that the University made to the Presbyterian Church –

MR. DOYLE:  Your Honor, I'm going to –

MR. TIBBETTS:   —can best be quantified—

MR. DOYLE:    I'm going to object to that he's characterizing things as defamation.

THE COURT:    Sir, you had agreed to testify with respect to damages.

MR. TIBBETTS:   *That's what I'm doing.*

THE COURT:   So why don't we focus in on what happened without—

MR. TIBBETTS:   The damages can best be quantified by my loss of my commission.  My commission at that time was, as a lieutenant, it was about $30,000.
. . . . My commission at that time was, as a lieutenant, it was about $30,000.

MR. DOYLE:  *I'm going to object to this testimony on the ground that there's no foundation as to why he hasn't a commission.  That's not for him to say.*

THE COURT:  You're going to have an opportunity to examine him. . . . *Why don't you finish up sir.*

MR. TIBBETTS:  Thank you, Your Honor. . . . All I know is that I was very damaged by what the University said and did.  I know that I lost my commission.  I know that I was – I am not able to be able to undertake a career in the undertaking that I wanted to do.

MR. DOYLE:  Your Honor, I'm going to object to that.  *I'm going to move to strike it on the grounds it's simply a conclusion that his witness is drawing.  It's not based on competent evidence, and it's simply argument.  It's not evidence.*

THE COURT:  It's overruled.   Are you done sir?

MR. TIBBETTS:  Yes, Your Honor.

THE COURT:  You want to inquire?

MR. DOYLE:  *Absolutely not.*

THE COURT:   All right.  The record may reflect there was no cross-examination of the witness.  You can step down.  [2 Tr. 12-20].

106.     Plaintiff's testimony on damages lasted approximately 8 minutes.   As before, this testimony was punctuated with staccato-like objections by defendants' counsel.  There was no cross-examination.  The jury saw no evidence from the university's records because the court had struck 90% of these records, which contained evidence on plaintiff's damages.   The jury certainly did not hear from plaintiff's witnesses or economic experts on damages.

### II (12)          Defendants Move For a "Mistrial" Due to FRE 602 Violations

107.     As soon as the court excused the jury at the end of the plaintiff's "limited" testimony on "damages," a heated controversy erupted.   Defendants' counsel was adamant over (1) the evidentiary problems with plaintiff's running narrative, (2) the "suspension of the rules of evidence" for a *pro se* plaintiff, and (3) the court's decision to send both the plaintiff's claims for defamation *and intentional infliction of emotion distress* to the jury.   Again, the transcript captures the surprise and procedural  confusion over these last minute rulings from the bench:

MR. DOYLE:  *First, Your Honor, I move to strike Mr. Tibbetts' statement on a number of grounds.*   First, he was permitted, as he was yesterday, simply to deliver a narrative to the jury, *which is not appropriate*.  Secondly, he was permitted to state his conclusion and opinion as to why he did not become a Presbyterian minister.  His statements and conclusions as to why he wasn't an officer in the reserve, nothing more than a claim, not competent evidence.
*Rule 602 requires a witness may not testify to a matter unless evidence is introduced sufficient to support a finding of the witnesses' personal knowledge of the matter.  Other folks did.  And he's not the one to testify as to why the Presbyterian Church did nor didn't do certain things or why the Navy did nor didn't do certain things or why Beijing did or didn't do certain things.*

I realize that a pro se Plaintiff is afforded certain latitude, but it doesn't – it's not right that the fact that he's a pro se did not permit the *suspension of the rules of evidence*, which I submit is what happened here today what happened yesterday.

Your Honor has indicated to us now that you're going to send to the jury the intentional interference, intentional infliction of emotional distress. *I previously understood that only defamation was going.* [emphasis added].

THE COURT:  And I apologize to you, but we'll have a further charging conference here in a few minutes.

MR. DOYLE:  Well, I make a motion pursuant to Rule 50 of the Federal Rules of Procedure for judgment in favor of each of the Defendants and against Mr. Tibbetts on the grounds that there is no legally sufficient evidentiary basis for a reasonable jury to find for Mr. Tibbetts on any of his claims for relief against any of the Defendants.

And in connection with that motion I submit to Your Honor that what happened yesterday where he was permitted to do a narrative, I submit to you that putting someone under oath and then inviting him to tell the jury what he wants them hear doesn't make what he says competent evidence.  I refer again to Rule 602.

And the defamation claim that he talked about yesterday, this amplifies the problem with the narrative.  We then found out later in connection with arguing about documents that his claim that Mr. Dittes defamed him to the Presbyterian Church is based upon what people at the Presbyterian Church told him.   That's not competent evidence.  It's hearsay.  And Your Honor suggested yesterday that somehow –

THE COURT:  Sir, do you have a specific document to which you're referring that serves as the basis for your remark?

MR. DOYLE:  No, its what he said yesterday.  *I don't have a document.*  He said it yesterday.  When you asked him the basis for certain statements, he said it's based on what the Presbyterian Church told him, *not a document.  That's what he said here yesterday.*

THE COURT:  Okay.  I reviewed that very carefully, and reviewed exactly what he did say, and there was one small portion of his remarks that he claimed as the Presbyterian Church was the author of, . . .  and I will specifically instruct the jury to disregard it.

MR. DOYLE:  *That doesn't answer it Judge.  That doesn't deal with it.*  He gets out there and he says I was defamed.  That's a conclusion.  It's not based on competent evidence.  It's an argument.  He was put under oath and allowed to make an opening statement to the jury.  There wasn't evidence.  It's his view of the world.  And wasn't competent, and the record doesn't establish that he was competent to do that.  And I object to it.  And I argue that that does not provide a basis for sending *anything to the jury.*

*I also base my motion for judgment on the Court's error, and I don't know what the jury's going to be able to do with it, just dumping documents in front of*

15

*them, not in context, not with any evidence as to whether they were sent, who received them, the circumstances under which they're drafted. They're just dumped in front of them, which allows them all kinds of speculation. It's not appropriate.* [2 Tr. at 28.]

**II (13)        Defendants' Counsel Raised Statute of Limitations Argument for the First Time—An Issue That Should Have Been Resolved in a Pretrial Conference**

108.    Defendants' counsel then raised the issue of the statute of limitations for the first time in argument.    The court was not aware of any of the details surrounding this basic argument, which should have been resolved before the date of trial in a pretrial conference:

> MR. DOYLE:  And . . . in addition to my claim that there isn't evidence, legally sufficient evidence, for a reasonable jury to find for Mr. Tibbetts on that claim against any of the Defendants, I also argued on a title to judgment as a matter of law on the basis of the statute of limitations that applies to defamation.  It's pleaded as an affirmative defense.  Section 52-597, the Connecticut General Statutes.

> THE COURT:   And that was pleaded as an affirmative defense, sir?

> MR. DOYLE:   Certainly is, Your Honor. [2 Tr. 21-24].

109.    The court did not know anything about the issue of statute of limitations or the tolling agreement between the parties.    Again, this was strictly a pretrial issue *that should have been briefed and resolved prior to trial*:

> MR. TIBBETTS:  First of all, Your Honor, as you know, I'm not an attorney, and these are the kind of arguments that my attorney should be making.  These are important arguments, and I would like to have counsel make the arguments for the Court to make a ruling on it.
> Nevertheless, Your Honor, this case has been before this court for five years now.   This is the first time that Mr. Doyle is raising this. . . . [He is] arguing that the statute of limitation has expired.  In fact, it hasn't.  All of this happened over a three-year period.   It was continuous.   It wasn't that it was just one publication.  The documents show that they were published repeatedly to the Professional Studies Committee, the final one being on October 31st, 1992. . . .  [A]nd a tolling agreement, which Mr. Doyle hasn't told you about, was entered on October 6, 1994.

> THE COURT:  *Sir, what tolling agreement are we talking about here?*

MR. TIBBETTS:  A tolling agreement was entered into between myself and Yale University to stop me from filing suit immediately in October 6, 1994.  That tolling agreement was extended continuously on a monthly basis until May of 1995. . . . Mr. Doyle has known this for a long time.  Why is he bringing this up at the last minute?  If he believes so strongly in what he's – why hasn't he brought a motion to dismiss before the Court?  He could have brought this thing in . . . September of 1995.

. . . . *This a pretrial motion that should have been argued prior to even going to trial.  Now we're at trial, and they're bringing up something like this, which is completely last minute.* . . .

I think it is completely unfair.  I think it is despicable, Your Honor, that Mr. Doyle would wait five minutes before this goes to the jury to raise this issue.  He has known about this thing for five years.   He knew about it, he's been saying it in his first answer, that they were going to raise the statue of limitations.  If they were acting in good faith, they would have gone ahead and filed their motion to dismiss on a statute of limitations and *we would have been able to argue this thing out prior to this going to trial.*

THE COURT:   Did you have anything further, sir?

MR. TIBBETTS:  No, Your Honor.

THE COURT:   All right. The court will reserve decision on the motion.  I'm about to take a recess now.   Could you tell me, Attorney Doyle, where the defendant is on – are you going to make an evidentiary presentation?

MR. DOYLE:  No, Your Honor.   If you're asking me whether I'm going to move forward or whether I'm going to rest.

THE COURT:   Yes.

MR. DOYLE:  I rest.

THE COURT:   Okay.

MR. DOYLE:   And having rested, I renew my motion for judgment as a matter of law pursuant to Rule 50 for the same reasons I argued that motion should be granted at the close of Mr. Tibbetts' case.

THE COURT:   All right.   And the Court reserved decision on that.  We'll take a short recess, and then I'm going to have a further charging conference with you. [2 Tr. 28-40].

**II (14)**          **Court Admits Evidence for Defendants' After Both Parties Had Rested**

110.    After a brief recess, a controversy erupted because defendants' counsel wanted to introduce evidence *which had already been excluded*.   As already noted, both parties had "rested." Nevertheless, defendants' counsel moved to introduce evidence from Yale's  records which *was not on Yale letterhead.*  The trial transcript captures the furor created over this surprise development, especially where the court allowed defendants' counsel to give testimony on the document, but not allow the plaintiff to give any testimony on the evidence:

THE COURT:   Is there some problem that's developed, colleagues?

MR. DOYLE:  Yes, there is a problem, Your Honor.  You recall that there was a discussion about some additional documents that were going – Mr. Tibbetts was going to put in and other ones that I didn't object to.

THE COURT:  Yes, sir.

MR. DOYLE:   One of those documents that I understood from my conversation with Mr. Tibbetts that he was going to put in, and to which I didn't object, were the minutes of the Professional Studies Committee at which they voted on the charges that Mr. Dittes had brought.

THE COURT:   All right.

MR. DOYLE:  Signed by Detra MacDougall, and it's the minutes of the Professional Studies Committee.  Now, I rested on the assumption that based on our agreement—

THE COURT:  You want this admitted?

MR. DOYLE:  I want that admitted.

THE COURT:   All right.  Did you want to comment sir?

MR. TIBBETTS:   Your Honor, frankly I don't care whether it's admitted or not.

THE COURT:     Well, then, fine.

MR. TIBBETTS:    But Your Honor, if it's going to be admitted, ***there has to be additional material submitted on top of that, because that is what this entire case rests upon.***
[Referring to the document to be admitted]  For three years the University was bringing charges against me.  If you look at their own rules, it specifically says

that they have to provide all documents to the committee members. *They withheld
everything*, Your Honor, so that the committee *had nothing to vote on except what
Professor Dittes was saying before the committee. That's why those votes are so
skewed.*

Frankly, I mean they found in my favor, Your Honor, it doesn't hurt me, *but
if that's going to go in, the jury's going to find that the University withheld all of the
documents, and those documents right here that are not being submitted.*
[Suppressed Evidence]. *And I object strenuously, Your Honor, that if the jury is
going to find about that, that those documents have to go in, because that is where
the fraud occurred.*

The fraud occurred in that Bill Stempel [Yale official] told me that all
documents were going in [to the Professional Studies Committee]. I relied upon
what the University's own regulations are with respect to the committee. I believed
everything was going to be submitted. Everything had been submitted May 12th of
1992. Everything was withheld. I had no evidence whatsoever before the
committee other than what I was saying and what Professor Dittes was saying. *It
was an absolute free-for-all.*

MR. DOYLE:  Your Honor, since Mr. Tibbetts – I'm sorry.

THE COURT:  All right, there being no objection, this can become Defendant's exhibit. . . .
We're still working on the charge here. As soon as we have a draft of the charge,
we'll sit down with you again.  [2 Tr. 40-42].

111.    The surprise created over this last minute evidentiary admission should be readily

apparent.   First, under the court's very limited notion of "admissibility," this document was not on

Yale letterhead.   Thus, under the court's own guidelines, it could not be "self-authenticating."

Second, if the court changed its mind on this guideline at the last minute--this means there were

numerous other excluded documents which should have been admitted.  The foregoing simply

demonstrates the irregularity and contradiction of the court's notion of admissibility in this case.

112.    Third, the bigger problem is that the court allowed defendants' counsel to testify on

this document in closing argument.   There had been no prior testimony or evidence on the matter.

There was no testimony from any of the defendants.   And defendants' counsel certainly didn't have

personal knowledge of the document to comment or testify upon it.   In short, testimony from

defendants' counsel was the *very first time* that the jury had heard anything about this matter, *and in closing argument of all times.*

113.    With the court's surprise move in allowing the defendants to introduce evidence in closing argument, after both parties had "rested," and without allowing plaintiff the opportunity to comment or testify on this evidence—is altogether improper and in gross violation of civil procedure.

### II (15)    <u>Court Compels Plaintiff to Provide a Closing Argument</u>

114.    The jury was called into the courtroom.    The following excerpts depict the level of surprise and procedural confusion which the jury witnessed during closing arguments:

THE COURT:    The record may reflect that our jury has returned to the courtroom.
*I apologize to you for the fact that this case has not been presented to you in a more temporally smooth flowing fashion. . . .*

The evidentiary portion of the trial is now complete, and these parties will make their closing comments to you.  Depending on how long those comments take, we may take a short recess, and then I'll deliver the charge, and the matter will be committed to your hands.  So as I say, *at least the good news is that you're going to be out of here a good deal sooner that we initially thought would be the case.*

Mr. Tibbetts would you care to comment, sir?

MR. TIBBETTS:   By commenting, does that mean I give my closing argument?

THE COURT:   Yes, sir.

MR. TIBBETTS:   [To the jury]  This has been quite an experience for me.   I don't really know where to begin, but I thank you for taking the time to listen to both of our sides.
. . . . I am alleging in my complaint against the University that at least one professor had made some very, very serious allegations about me, and that these allegations in effect blocked by ability to become ordained in the Presbyterian Church, and that there were also further reaching damages that occurred from those allegations which included my loss of commission with the Navy as a chaplain.
I thought maybe that I'd read to you what defamation is from the dictionary. It comes from the Latin, which means to harm the reputation . . . of a person's character.  And what I contend is that in these documents that will be presented to you, that that these documents would show that various allegations did harm my

character. . . . [W]hat I contend is that Professor Dittes went far – went further than he should have in making allegations that were criminal, alleging that I was, you know, forging affidavits, that I was altering other affidavits, that I was committing fraud upon the Navy to try and prove that these essays were mailed.  He was saying that I had lied about my father's [death] to try and get credit for [his course].  He was saying that I was a fugitive from the law.  He was saying that I was trying to be ordained in the American Baptist Church but that  . . . based upon his allegations, that I was dismissed from the American Baptist Church because of moral turpitude, and –

MR. DOYLE:  Your Honor, I'm going to object to that.  There's no evidence of that on the record.

THE COURT:   Hearsay.

MR. DOYLE:  None.

MR. TIBBETTS:  I testified to that.   In any event, this is far more than one needs to show that the essays were not mailed.  You will see Plaintiff's Exhibit 8.

MR. DOYLE:  *Your Honor, would you instruct the jury to disregard?*

THE COURT:  We'll take it all up that the time that charge the jury.

MR. TIBBETTS:  . . . . Plaintiff's Exhibit 8 is my father's death certificate.  I supplied it to the University to prove that in fact my father did die.  Mr. Dittes had told my Candidate's Committee –

MR. DOYLE:  Your Honor, I object to that.  There's no evidence of this.

THE COURT:  There's evidence his father died.

MR. DOYLE:  There's evidence his father died, *but not what he's now saying,* Your Honor.

THE COURT:  You're in a difficult spot, sir, because this is the time that you comment on the evidence.

MR. TIBBETTS:  *That's what I'm doing*, *Your Honor.*  And I have mentioned that that was the allegation that I had to disprove that Professor Dittes was saying that I was lying about my father's death.  That's why this is in the record.

MR. DOYLE:  There's no evidence of that, Your Honor.

THE COURT:   Just keep going, sir.

MR. TIBBETTS:   As I was saying, . . . . [Dittes] is saying that he doesn't believe the account that I had provided to the University was true or accurate.  He is saying that there are discrepancies on my Navy log. . . .

MR. DOYLE:  Your Honor, *there is no evidence to that.*

THE COURT:  Be careful here.  Comment about the evidence.  You never said that before, sir.  You're commenting now on the evidence that was introduced to the jury.

MR. TIBBETTS:  Well, Your Honor, we're talking about the discrepancy, which deals with my Navy log.  We know there were charges –

THE COURT:  If you want to read from the exhibit, by all means, sir, but try not to embellish, please.

MR. TIBBETTS:  Okay.  Again, I'm not an attorney.  I'm doing the best that I can.

    . . . . At the final hearing that took place I submitted all of my documentation from the Navy showing that my Navy travel voucher was completely –

MR. DOYLE:  Your Honor*, I'm going to object to this.  There's no evidence of this. There's no evidence of it.*

MR. TIBBETTS:  Your Honor.

THE COURT:  You got to –

MR. TIBBETTS:  I was cleared that the charge based upon –

MR. DOYLE:   Your Honor, please.

THE COURT:  See, this is not the evidentiary portion of the trial, sir.  This is the opportunity that you have to comment on the evidence.

MR. TIBBETTS:  *That's why I asked to be represented by counsel here*.  I can't do this.  I mean, I am too closely involved with this.  I am doing the very best that I can.  And Mr. Doyle is jumping up and down.  He knows very well what the record is.  Just because it hasn't been submitted –

MR. DOYLE:  Your Honor.

THE COURT:  Sir, please, finish up your comments.

MR. TIBBETTS:  All right.  In any event, Mr. Doyle excuse me, Mr. Dittes wrote on January 15th, 1990, based upon these essays, and I will quote:  "If Mr. Tibbetts has not completed the course work in a timely fashion as I believe to be the case, then he

is guilty of substantial fraud" . . . . This was put in my student record.  It was also published to the Presbyterian Church.

MR. DOYLE:  I'm sorry, Your Honor, I object to that.  *There is no evidence of that.*

MR. TIBBETTS:  Your Honor*, if I could have presented what I received from the Presbyterian Church, they would have verified that –*

MR. DOYLE:  Your Honor, he's –

THE COURT.  It's your obligation to present the evidence here.  You have presented a certain amount of evidence here to this jury, and now is the opportunity for you to comment with respect to that evidence and that evidence only, and not talk about things that you believe or the things that you otherwise know.  The jury is to decide the case on the evidence that's been presented.

MR. TIBBETTS:  Your Honor, *I thought that I had testified to that earlier.*  I'm almost positive that I did.  In any event, . . . . [b]ased upon those allegations that were presented to me that I had to answer before the Professional Studies Committee, I went to the Navy.  I asked them to make an investigation.  They made the –

MR. DOYLE:  Your Honor, I object to this.  There's no evidence.

THE COURT:  There's no evidence of that.

MR. TIBBETTS:  *This is actually the first time that we're getting into the documents.*  I only gave an opening statement of saying what I was going to be able to prove.  This proves it.  Again, Your Honor, I am doing the best that I can.

THE COURT:  You've elected to come in here and represent yourself.

MR. TIBBETTS.  *No, Your Honor*—

THE COURT:  But you still have to abide by our rules here, sir.  This is the time to comment about the evidence. . . . This is not the time for further or additional testimony, sir.

MR. TIBBETTS:  Your Honor, I'm simply trying to show, as I had said in my opening statement, that I would be able to prove that what I was saying on the stand can be corroborated by Yale's documents.  They are corroborated exactly as I have just said.

THE COURT:  Read the document.  Read what is corroborative of your claims here, sir, in the documents, but don't furnish additional testimony.

MR. TIBBETTS:  Plaintiff's Exhibit 24.  Mr. Dittes was writing to the Presbyterian Church in Virginia. . . . he then says, I am sorry that I cannot supply an address for me . . . presumably as a way of avoiding several former landlords who have claims of unpaid rent.  I was informed that Mr. Dittes was saying—

MR. DOYLE:  Your Honor, I'm going to object to anything—

THE COURT:  You can't tell us what you were informed, sir.

MR. TIBBETTS:  As I testified, Mr. Dittes said that I was a fugitive from the law.  I had to go the Virginia police, Connecticut police, to prove that. . . . These were all proven to be incorrect.

MR. DOYLE:  Object, Your Honor.  *There's no evidence that that was proven to be incorrect, none.*

MR. TIBBETTS:  *Your own submission was proven it was correct.*

MR. DOYLE:  *Not so.*

THE COURT:  Is there some document that says that, sir?  Can you read that it's proven to be incorrect?

MR. TIBBETTS:  Yes.

THE COURT:   This is an exhibit you're reading?

MR. TIBBETTS:  This is Defendant's Exhibit number 4 . . . . And it says, wait a minute, by a vote of three they say that it did not.

MR. DOYLE:  *Mischaracterizing the document, but I'll deal with it at the appropriate time*, Your Honor.  [2 Tr.  45-57]

115.    This farce of a closing argument continued for another six minutes or so.   Plaintiff tried to provide the jury with the truth of the university's records.  However, defendants' counsel objected to everything the plaintiff said or tried to say.   For example, defendants' counsel did not want the jury to hear that the university had denied plaintiff an attorney for the university's criminal charges.   As demonstrated below, he drowned out everything regarding the truth of the university's records:

MR. TIBBETTS:   [Dittes was] alleging that there were fraud and forgery on various affidavits, Russell Raymond's affidavit, which are crimes under Connecticut and federal law.   These were placed in my student record.

MR. DOYLE:  Your Honor, *there's no evidence that it was placed in the student record.*

MR. TIBBETTS:  *This was the student record that was provided to me*, Your Honor, from the University.

THE COURT:   There's no evidence of it, sir.

MR. TIBBETTS:  *But this is my student record.*

MR. DOYLE:  Your Honor, he's trying to testify.

MR. TIBBETTS:  They alleged that I had a psychopathic personality, that I lied about my father's death, that I allegedly committed forgery on two notarized affidavits, one from Russell Raymond, and one from Claudia Fabricant. . . . that I committed fraud on my Navy documents.   He also alleged that I was a fugitive from the law.   These are all false statements.  *They were all proven to be false.   The University never made an investigation to disprove them.*

 --------

MR. TIBBETTS:   As I testified earlier, when this case actually was heard, October 31, 1992, a year and a half later, none of the documents that I had submitted were submitted to –

MR. DOYLE:   Your Honor, I object to this.  There's no evidence of this.

MR. TIBBETTS:   They also state that witnesses –

THE COURT:   Are you reading from something that says none of your documents were submitted?

MR. TIBBETTS:   No. As I testified earlier, there was no evidence presented.  *We agreed with that earlier.*

MR. DOYLE:   No, there's no agreement, Your Honor.

THE COURT:    Go ahead, sir.

MR. TIBBETTS:   Thank you.  Finally, it says:   "In hearings involving potential simple or preliminary cases, the student may have a lawyer present at the hearing."  I was denied an attorney.

MR. DOYLE:   *There's no evidence that he was denied an attorney.*

THE COURT:   There's no evidence of that.  There's been no evidence that you were denied an attorney, sir.  You're just saying that for the first time.

MR. TIBBETTS:   Well, Your Honor, I mean –

THE COURT:    Folks, you simply must disregard that.  Please continue.

MR. TIBBETTS:   *This shows that I was not provided an attorney.  The evidence is on the exhibit.*

THE COURT:   Well, read it.  Please read it.  If there's something in the exhibit that says that, please read it.

MR. TIBBETTS:   Your Honor, the document says that I appeared before the committee, that only I appeared before the committee, that there was no attorney present.

MR. DOYLE:   *Doesn't say that.*    Doesn't say – says appeared before the committee.  *Doesn't say he was denied any lawyer.*

MR.  TIBBETTS:   Well, then let's go to the document where I was asking for an attorney, then. . . . Here's the document, Plaintiff's Exhibit 44, this is from William Stempel.  I had been asking for an attorney based upon the criminal charges that I was facing . . . .

THE COURT:   Do you have something there that says that somebody's denying you –

MR. TIBBETTS:   Yes.

THE COURT:    Read it.

MR. TIBBETTS:   "As I told you plainly in our telephone conversation, representing you at any disciplinary hearing at the divinity school, or in any other matter, that neither I nor any other lawyer in my office will be representing you. . . ."

MR. DOYLE:   Excuse me, what exhibit is that?

MR. TIBBETTS:  Plaintiff's Exhibit 62.   And as I have testified, I put together to the best of my ability every answer to what Yale was trying to bring up, *and I believe I testified that none of this evidence was ever presented to the committee in violation of the committee's own rules.* [2 Tr. 60-63, 65-67, 72-73].

26

**II (16) Court Removed Elements of "Qualified Privilege" From Jury Charge Without
Plaintiff's Knowledge or Consent**

116.    Throughout plaintiff's closing argument, defendant's counsel attempted to drown out

any admission of evidence from the university's records.   And as if this was not enough of a

surprise, the court removed key elements regarding "qualified privilege" on the defamation charge

to the jury at the last minute.   As a consequence, plaintiff was precluded from proving anything to

the jury regarding this defamation charge:

> MR. TIBBETTS:  Your Honor, did we take out this section where there were five specific
> elements as to what the qualified privilege was?

> MR. DOYLE:   Your Honor –

> THE COURT:   There is a running narrative there of privilege.

> MR. TIBBETTS:   But what happened to the five specific elements we need to prove?

> THE COURT:  Sir, you can read from the proposed charge.   What you see there is the
> proposed charge.

> MR. TIBBETTS:   *Your Honor, it was in the earlier one, it's not in the latest one.  These
> are the one I'm referring to, Your Honor.   One through five, that's been taken out*.

> THE COURT:   *You cannot read that, sir.*  [2 Tr. 68-69].
> -------
> MR. TIBBETTS:   I will conclude.   Mr. Doyle is going to get up here in a few minutes . . .
> to say that the distress was not severe.   He is going to say that I was not damaged.
> He is going to say that the record does not reflect what happened here.   These are
> the University's own documents.   He's going to try and say that perhaps I didn't
> understand the charges, and that the University acted properly during that three
> years.
>
> The only thing I'm going to leave with you is that if the University acted properly
> for three years, why did this go on for three years?   There was a point where the
> University tried to hold a hearing.   They gave me one week notice.

> MR. DOYLE:  Your Honor, there's no evidence of this.

> MR. TIBBETTS:   I apologize.  I realize that.   Again, Your Honor, I am too emotionally
> involved in this to try and do it.   I'm doing the best I can.   I apologize.   What else
> am I supposed to do at this point?

THE COURT:   Say thank you.

MR. TIBBETTS:   Thank you.

THE COURT:  Their lunches are out there.  Do you want to take a few minutes?  I don't
want to interfere with their lunch, and it is 20 after 1:00.   Folks why don't you take
lunch here and after you have lunch let us know when you're done, if you would.
Just knock on the door.  [2 Tr. 78-79]

117.    In summarizing the plaintiff's closing argument, the jury saw or heard the
following:   (1) confusion over what constituted admissible evidence from the university's records
(*passim*); (2) defendant's counsel attempt to "strike" or have the jury "disregard" references to the
university's documents (2 Tr. 49:9, 50, 51:22, 55:5, 56, 57:13, 58, 59, 60,61:4, 63, 66, 68, 73, 77,
79);  (3) plaintiff's request for "counsel" and statements that he is doing the "best" he can (2 Tr.
5:9-10, 52, 53:11, 61, 79:7); (4) arguments from defendants' counsel that plaintiff's comments or
testimony was "hearsay" (*passim*), (5) the court telling plaintiff what he could or could not "say,"
"comment upon," or "read" in closing argument (2 Tr. 49, 51, 52, 52, 53, 55, 56, 57, 59, 60, 61, 62,
63, 66, 68, 69, 77, 79); and finally (6) the court's condescending attitude in telling the plaintiff to
"finish up," "wrap up," or say "thank you." (2 Tr. 52, 55, 60, 69, 79)

**II (17)          The Court Is Condescending Toward Plaintiff Throughout Trial**

118.    There is no mistake that the court was hostile, patronizing and condescending to the
*pro se* plaintiff throughout the trial.   Moreover, the court demonstrated this contempt in full view
of the jury, which not only tainted the limited evidence but also trashed the validity of the plaintiff's
claims.   A jury can clearly be influenced by a judge's attitude toward a litigant.   In this case, any
reasonable mind could find that the jury was influenced by the judge's impatient and condescending
attitude toward this plaintiff:

2 Tr. 14:24              "Go ahead, finish up sir."

| | |
|---|---|
| 2 Tr. 16:24 | "Finish up, sir." |
| 2 Tr. 18:18 | "Why don't you finish up sir?" |
| 2 Tr. 44:12-14 | [To the jury] "I apologize to you for the fact that this case has not been presented to you in a more temporally flowing fashion." |
| 2 Tr. 44:20-22 | [To the jury] "At least the good news is that you're going to be out of here a good deal sooner than I we initially thought would be the case." |
| 2 Tr. 49:21-23 | "You are in a difficult spot, sir, because this is the time that comment on the evidence." |
| 2 Tr. 50:4 | "Just keep going sir." |
| 2 Tr. 52:12-13 | "Sir, please finish up your comments here" |
| 2 Tr. 55:12-3 | "You've elected to come in here an represent yourself" |
| 2 Tr. 55:18-19 | "This is not the time for further or additional testimony, sir." |
| 2 Tr. 55-56 | "Read the document what is corroborative of your claims here sir, in the documents, but don't furnish additional testimony." |
| 2 Tr. 56:15-16 | "You can't tell us what you were informed, sir." |
| 2 Tr. 57:4-5 | "Is there some document that says that sir?   Can you read that it is proven incorrect. . . . This is an exhibit you're reading?" |
| 2 Tr. 59:9-11 | "Do the letters have dates on them?  Alright, comment then." |
| 2 Tr. 60:13-14 | "Are you reading from something that says none of your documents were submitted?" |
| 2 Tr. 60:16 | "Go ahead, sir." |
| 2 Tr. 60-61:-2 | "There is no evidence of that.  There's been no evidence that you were denied an attorney, sir.   You're just saying that for the first time." |
| 2 Tr. 61:8-9 | "Well, read it, please read it.   If there is something in the exhibit that says that, please read it." |
| 2 Tr. 62:18-21 | "Do you have something there that says that somebody's denying you— "Read it." |
| 2 Tr. 66:16 | "There is no evidence of it, sir." |

| | |
|---|---|
| 2 Tr. 69:1 | "You cannot read that, sir." |
| 2 Tr. 69:8 | "Sir, continue with your argument." |
| 2 Tr. 77:11-12 | "There is no evidence, sir, you are just testifying in front of the jury." |
| 2 Tr. 85:23-24 | "Please sir, there is various evidence in here. He is entitled to comment on it just as you were." |
| 2 Tr. 87:8-9 | "Sir, are you claiming that there is not such a document in the file?" |
| 2 Tr. 87:17 | "Just let him finish please sir." |
| 2 Tr. 88:6 | "Sir, this is the time to comment on—" |
| 2 Tr. 90:2-4 | "Sir it is a document in evidence. It is a document that you introduced into evidence, just as you are permitted to read from the –" |
| 2 Tr. 90:12-13 | "Sir, we have a number of exhibits in here. They have …" |
| 2 Tr. 92-3-4 | "Sir, the gentleman is reading the content of the exhibits that you introduced into evidence |
| 2 Tr. 92:17-20 | "Sir this is the time in the proceeding where as I explained to you, counsel are entitled to comment about the evidence. The gentlemen isn't even being given a chance to comment. |
| 2 Tr. 93-19-20 | "I'm going to ask you to not comment further here, and to allow—" |
| 2 Tr. 93-94:1 | "Sir, this is your documents that you introduced into evidence." |
| 2 Tr. 94:11-13 | "I ask you not to comment further or I'm going to have the marshal remove you from the room. Now please be seated." |
| 2 Tr. 97:1-4 | [Plaintiff] "Your Honor, I don't understand. Is this a closing argument?" |
| 2 Tr. 97: 4 | "Certainly is." |
| 2 Tr. 97:8 | "Sir, it has been. It is in evidence." |
| 2 Tr. 97:10 | "He's making his closing argument." |
| 2 Tr. 97: 15 | "Sir, I ask you to be seated." |

| | |
|---|---|
| 2 Tr. 97-98:1-2 | "Simply does not bar him from commenting about the evidence or the exhibits.  Now please, I'm – sit sir.   And marshal, if he speaks up again, I'll ask to assist the gentlemen from the courtroom. |
| 2 Tr. 98:24 | "Keep going sir.  Finish up." |
| 2 Tr. 113:19-20 | "Mr. Tibbetts do you have anything by way of brief rebuttal sir? |
| 2 Tr. 114:15 | "What's your point, sir?" |
| 2 Tr. 155:1-2 | "But what's your point, sir?" |
| 2 Tr. 115:10 | "You can't have additional testimony" |
| 2 Tr. 115: 16 | "That's your claim?" |
| 2 Tr. 115:19 | "You already testified to that." |
| 2 Tr. 116: 9 | "Keep it confined to the evidence, sir." |
| 2 Tr. 116: 25-26 | "Would you just, if you could address your remarks in the context of – rebuttal is usually in the context of what the other person said, it would be helpful." |
| 2 Tr. 117: 11 | "There's no evidence of that." |
| 2 Tr. 117: 14-15 | "There's something about you going to the FBI?" |
| 2 Tr. 117:25 | "Wrap it up.   Finish it up, if you would." |
| 2 Tr. 121:7-14 | "You got a conflict.  Why don't you wrap up, sir.  We have a conflict on the evidence." |
| 2 Tr. 121:13-14 | "Would you finish up please sir." |
| 2 Tr. 121:20-21 | "You can comment about the evidence, but we don't need any additional evidence, sir. |
| 2 Tr. 121: 25-26:1-2 | "we're simply trying to avoid getting any more evidence in." |
| 2 Tr. 122:5 | "Could you finish up, if you will sir." |
| 2 Tr. 122:11-12 | "It's not permitted under the rules at this time, sir.   We're finished with the evidentiary portion of the proceeding." |

| | |
|---|---|
| 2 Tr. 122: 23 | "It is not something to bring up in front of the jury.  Would you wrap up, please sir." |
| 2 Tr. 123:4 | "About done sir?" |
| 2 Tr. 123: 7-9 | "Because we are trying to conduct a trial in an orderly fashion, and this is the time where you can make –" |
| 2 Tr. 123:113 | "Would you finish up please, sir." |
| 2 Tr. 125:25 | "All right, sir, thanks." |
| 2 Tr. 126:1-3 | "Wrap up, if you will." |
| 2 Tr. 150:6-7 | "Well, obviously you realize that the jury in a few minutes here is going to start deliberating." |
| 2 Tr.  154:25 | "Were you done, sir?" |

### II (18)        The Court and Defendants Admit Error in the Trial

119.    At the conclusion of this lopsided presentation of evidence before the jury, the court

conceded that that "*we're all troubled here by trying to understand just what the evidence is in view*

*of the way it's all been presented*."  2 Tr. 79-80:1.   This impression of the trial was also mirrored

by defendants' counsel, who stated in his closing argument as follows:

> MR. DOYLE:    [L]adies and gentlemen of the jury, first I want to thank you for your patience.  This has not been an easy trial for any of us.  It's been obviously difficult for the Judge, particularly difficult for Mr. Tibbetts, and I can say for myself, difficult for me, because this is not how trials are usually conducted.

120.    The court then echoed the apology of defendants' counsel for the haphazard and

"disjointed" manner in which evidence was presented to the jury.   Indeed, the court stated to the

jurors as follows:

> "Ladies and Gentlemen, . . .  I accept responsibility and apologize here to you for the somewhat disjointed fashion in which the matter was presented to you."  [2 Tr. 178:4-7]

121.    As a result of these extraordinary circumstances outside the mainstream of acceptable trials where there are actually attorneys presenting evidence and examining witnesses and experts, there is no question here that the Second Circuit would find "surprise" and "procedural confusion" throughout this trial.    The evidence of such unfair surprise and procedural confusion is evident from the following facts before this Court:

(1)    the court's failure to hold a pretrial conference

(2)    the court's failure to allow meaningful discovery, amendments or consolidation of claims;

(3)    the defendants' failure to show for trial;

(4)    the failure of plaintiff's counsel to appear for trial;

(5)    the court's failure to subpoena the defendants for examination at trial;

(6)    the court's failure to allow plaintiff's counsel time to complete discovery and prepare the case for trial;

(7)    the court's failure to extend time so that plaintiff's witnesses and experts could testify;

(8)    the plaintiff's requests and pleas for "counsel" throughout the trial;

(9)    the procedural confusion regarding the Writ of Mandamus before the Second Circuit;

(10)    the court's arbitrary suppression of 90% of the university's records;

(11)    the court's "suspen[sion]" of FRE 602 in plaintiff's testimony;

(12)    the court striking two of the plaintiff's four claims at the last minute;

(18)    the confusion over last minute charges to the jury;

(19)    the confusion over the evidence admitted into the case;

(20)    the court's error in introducing evidence in the closing argument stage

(21)    the court's error in allowing defendants' counsel to testify at closing argument on matters that had not been in evidence or testimony—until the closing argument

(22)    the court's error in not allowing plaintiff the opportunity to provide testimony on the last minute evidence introduced for defendants in closing argument;

(23)    the court's admission that it was "simply trying to avoid getting any more evidence in" [2 Tr. 122:1-2] and finally

(24)    the court's own admission that "*we're all troubled here by trying to understand just what the evidence is in view of the way it's all been presented.*"  2 Tr. 79-80:1.

122.    As noted above, Rule 60(b)(1) "authorizes the court to give relief from judgment, order, or proceeding for 'mistake, inadvertence, surprise, or excusable neglect."  Wright & Miller, *Federal Practice & Procedure*, Civil 2d § 2857 at 264.   The courts have granted relief under Rule 60(b)(1) for a wide variety of cases to include:  "mistake or excusable neglect of a party not represented by counsel"[1] or "unable to communicate with counsel,"[2] or where judgments were "entered because of the failure of a party to appear at trial,"[3] or were "they were based on a misunderstanding about appearance and representation by counsel,"[4] or which resulted "from confusion over the trial date,"[5] or "because of confusion about the procedural posture of the case."[6] Wright & Miller, § 2857 at 265-268.     These instances of relief are all present in the instant Rule 60(b)(1) case.

123.    The sum total of the unfair surprises and evidentiary confusion in the above trial is that plaintiff was unable to be represented by his counsel, and as a consequence all of the evidence

---

[1]     *Falk v. Allen*, 739 F.2d 461 (9th Cir. 1984) (not represented by counsel); *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156 (6th Cir. 1980) (same).

[2]     *Vindigni v. Meyer*, 441 F.2d 376 (2d Cir. 1971) (unable to communicate with counsel); *Russell v. Cunningham*, 279 F.2d 797 (1960) (same).

[3]     *Denman v. Shubow*, 413 F.2d 258 (1st Cir. 1969) (failure to appear).

[4]     *U.S. v. Forty-Eight Thousand, Five Hundred Ninety-Five Dollars*, 705 F.2d 909 (7th Cir. 1983) (misunderstanding about appearance of counsel); *United Coin Meter Co.*, 705 F.2d 839 (6th Cir. 1983) (same).

[5]     *Ellingsworth v. Chrysler*, 665 F.2d 180 (7th Cir. 1981) (trial date confusion).

[6]     *Louisiana v. Sparks*, 978 F.2d 226 (E.D. La. 1992) (procedural confusion); *Carl Marks & Co. v. Union of Soviet Socialist Republics*, 665 F.2d 26 (2d Cir. 1988) (same).

and testimony that would have ordinarily would have been entered or taken, was not; and as a result, the plaintiff was "prevented" from his constitutional right to due process because he was denied an "*opportunity to be heard 'at a meaningful time and in a meaningful manner.*'" *Mathews,* 424 U.S. at 333; *Armstrong*, 380 U.S. at 552; *Grannis*, 234 U.S. at 394.   As a result of this "surprise" and "mistake," which could have easily been rectified by the court taking proper planning steps for this trial, the resulting judgment is therefore voidable because the court "acted in a manner inconsistent with due process of law."  11 Wright, Miller & Kane, <u>Federal Practice and Procedure</u>: Civil 2d § 2862; *Otte,*  596 F.2d at 1099; *Fustok,*  873 F.2d at 39; *Parker,* 197 FRD at 215-216 (D.C. Conn. 2000) ("A judgment is void under Rule 60(b) . . . if the court which rendered it . . . acted in a manner inconsistent with due process of law").

### K.    COURT FOSTERS AN OPPORTUNITY FOR DEFENDANTS' FRAUD BY <u>SUPPRESSING 90% OF THE UNIVERSITY'S RECORD</u>

124.    Plaintiff hereby repleads and incorporates by reference each and every allegation set forth above, and further states as follows:

125.    The presence of fraud in a trial prevents a party from fully being "*heard 'at a meaningful time and in a meaningful manner.*'" *Mathews,* 424 U.S. at 333; *Armstrong*, 380 U.S. at 552; *Grannis*, 234 U.S. at 394.   In this case, where the court arbitrarily suppressed 90% of the university's record, "suspended" the Federal Rules of Evidence, and refused to let the jurors hear testimony from either the defendants or the plaintiff's witnesses and experts, and even condoned the defendants' fraud and misrepresentations about what was, or was not, in the university's records, without making any investigation or examination therefore, created a resulting judgment that is voidable because the court "acted in a manner inconsistent with due process of law."  11 Wright, Miller & Kane, <u>Federal Practice and Procedure</u>: Civil 2d § 2862; *Otte,*  596 F.2d at 1099; *Fustok,*

873 F.2d at 39; *Parker,* 197 FRD at 215-216 (D.C. Conn. 2000) ("judgment is void under Rule 60(b) . . . if the court . . . acted in a manner inconsistent with due process of law").

126.    In support of how this court acted in a manner inconsistent with due process of law, we turn to the fact that the court knew, or reasonably should have known, that a fraud was being perpetrated upon the court, but the court did nothing about it and allowed defendants' counsel to make no less than sixty-six (66) material misrepresentations about the university's record—of which the court had arbitrarily suppressed 90% of these records on the absurd finding that not all of the university's records were on official university letterhead.   By allowing a fraud to be perpetrated upon the jury, the court clearly "acted in a manner inconsistent with due process of law."  11 Wright, Miller & Kane, <u>Federal Practice and Procedure</u>: Civil 2d § 2862; *Otte,*  596 F.2d at 1099; *Fustok,*  873 F.2d at 39; *Parker,* 197 FRD at 215-216.

### M.    <u>RULE 60(B)(3):   "FRAUD"</u>

127.    Under Rule 60(b)(3), the court may relieve a party from a final judgment, order or proceeding for "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party."  F.R.Civ.P. 60(b)(3).   A Rule 60(b)(3) motion reaches all fraud and "rejects the confusing distinction between extrinsic and intrinsic fraud."  Wright, Miller & Kane, <u>Federal Practice and Procedure: Civil 2d</u> §  2860 (2d ed. 1995).   Rule 60(b)(3) expressly rejects the old, equitable distinction between "extrinsic" and "intrinsic" fraud.  *Id.*  Under the rule, a party may be relieved from a judgment on basis of fraud, regardless of whether the fraud could be classified as "intrinsic" (fraud that involves matters actually presented and considered in trial) or "extrinsic" (fraud that does not involve what was actually tried but nevertheless prevented a party from obtaining a fair trial.).  Matthew Bender, 11 Federal Practice, Rule 60-20 (2d ed. 2002).   Therefore, judgments may be set aside for a wide variety of alleged "frauds," including, for

example, "an allegation that false documents were presented." *Id.* (citing *Londorf v. Seefeldt*, 47

F.3d 893, 897-898 (7th Cir. 1995) (relief granted when defense presented testimony on false training

schedule).    The controlling test is "whether the alleged fraud prevented the moving party from

fully and fairly presenting his or her case at trial." *Id.* (citing *Anderson v. Cryovac, Inc.*, 862 F.2d

910, 923, 926 (1st Cir. 1988) (moving party must show that non-disclosure or misrepresentation of

material documents "worked some substantial interference with the full and fair presentation of the

case.")); *Lawrence v. Wink (In re Lawrence)*, 293 F.3d 615, 626 (2d Cir. 2002) ("alleged fraud of

the defendants prevented the issue of fairness from being fully explored.").

128.    In summary, "relief from a judgment or order may be permitted where (1) the

moving party possessed a meritorious claim at trial, (2) the adverse party engaged in fraud,

misrepresentation, or other misconduct, and (3) the adverse party's conduct prevented the moving

party from fully and fairly presenting its case during trial." Federal Rules Civil Handbook, (12th ed.

2005) at 948; Wright & Miller, Federal Practice and Procedure: Civil 2d § 2860; 3 Moore's Federal

Practice, *Lawrence*, 293 F.3d at 626; *see also Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d

Cir. 1989).

129.    Under a Rule 60(b)(3) motion, the burden of proof of fraud that a party was

"prevented from fully and fairly presenting its case" is on moving party.  *Clarkson Co. Shaheen*,

544 F.2d 624, 631 (2d Cir. 1976).    And the fraud must be established by clear and convincing

evidence.  *Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir. 1989).   To plead such fraud with

particularity, the moving party must show facts that give rise to "a strong inference of fraudulent

intent."  *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) *cert denied*, 1994

LEXIS 6978 .  "The requisite 'strong inference' of fraud may be established either (a) by alleging

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging

facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." 25

F.3d at 1128; *see also see also OBrien v. Nat. Property Analysts Partners*, 936 F.2d 674, 676 (2d

Cir. 1991) (fraud allegations may be pleaded by "inference" if supported by a sufficient "factual

basis"); *Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied*, 484 U.S.

1005, 98 L. Ed. 2d 650, 108 S. Ct. 698 (1988).

130.    Finally, if a Rule 60(b)(3) motion contains allegations that an attorney was involved

in the presentation of perjured testimony, or the presentation of knowingly false information, this

may support vacatur of the judgment where the tainted evidence goes to the integrity of the original

judgment. *Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078-80 (2 Cir.

1972 ) (non-disclosure of materially relevant documents certainly "afford[s] ground for collateral

attack."); *see also Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir., 1972) (same);

*Mastini v. American Tel. & Telegraph Co.*, 369 F.2d 378, 379 (2d Cir. 1966), *cert. denied*, 387 U.S.

933, 87 S. Ct. 2055, 18 L. Ed. 2d 994 (1967) (same); *Nederlandsche Handkel-Maatschappij v. Jay

Emm, Inc.*, 301 F.2d 115, 115 (2d Cir. 1962) (same).

131.    In the case at bar, defendants' attorney, William Doyle (hereinafter "Doyle"),

engaged in fraud and misrepresentation of the university's record which misled and tainted the jury

and precluded "the judicial machinery" from performing "in the usual manner its impartial task of

adjudging cases."   Defendants clearly had a legal and moral obligation to accurately present the

contents of the university's records, which the *Dittes* court had arbitrarily suppressed.

132.    As set forth below in detail, Doyle made 65 material misrepresentations to the jury

regarding the contents of the university's  suppressed records.    Clearly, 65 material

misrepresentations about the university's records, especially where each of these misrepresentations

can clearly and convincingly be shown as false and inaccurate, certainly "afford[s] ground for

collateral attack." *Kupferman Corp.*, 459 F.2d at 1078; *see also United States v. Keogh,* 391 F.2d 138, 147-148 (2d Cir. 1968) ("deliberate suppression" of material evidence is grounds for collateral attack).

133.    At issue here, then, is whether the 65 material misrepresentations by defendants' counsel "prevented the moving party from fully and fairly presenting [his] case during trial." Federal Rules Civil Handbook, at 948; *Lawrence*, 293 F.3d at 615 (the "fraud must have prevented the moving party from fully and fairly presenting his case.").

134.    As set forth below, defendants had "both motive and opportunity to commit fraud" where the *Dittes* court arbitrarily suppressed over 90% of the university's records and there were no defendants or plaintiff's witnesses at trial.   As a result, defendants could factually misrepresent the university's record at will.   Accordingly, where each of the 65 material misrepresentations can be shown with clear and convincing evidence as contrary and false to the university's own records, then plaintiff can establish defendants' fraud under the "clear and convincing" standard required by Rule 60(b)(3).  *Clarkson*, 544 F.2d at 631; *New York Univ.*, 865 F.2d at 484.

135.    In short, in the circumstances of this case, where defendants knew that 90% of their records had been suppressed, where they hid their defendants from trial, and where none of plaintiff's witnesses or experts. had been able to show for trial, then defendants' counsel could run rough shod over the jury and the court and represent anything he wanted to materially mislead and obfuscate the facts about the university's record.   Unquestionably, such a carte blanche in a courtroom to not be challenged creates a "strong inference of fraud," and here, defendants' 65 misrepresentations constitutes a "strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields,* 25 F.3d at 1128; *OBrien*, 936 F.2d at 676 (fraud allegations may be pleaded by "inference" if supported by a sufficient "factual basis").

136.    Accordingly, under the standard for relief set forth in Rule 60(b)(3), plaintiff can certainly demonstrate that he was "prevented" from "fully and fairly presenting his case at trial." Federal Rules Civil Handbook, at 948.   In this case, defendants' 65 material misrepresentations about the university's record clearly "worked some substantial interference with the full and fair presentation of the case," *Anderson,* 862 F.2d at 923, 926, and it certainly "prevented the issue of fairness from being fully explored." *Lawrence*, 293 F.3d at 626.

137.    The defendants' 66 material misrepresentations can be broken down or demonstrated in three main areas of the trial.   These three areas are as follows:  (1) plaintiff's testimony on damages, (3) plaintiff's closing argument, and (3) defendants' closing argument.

138.    A review of these three areas show that Doyle objected to, and moved to strike, plaintiff's statements about the truth of documents in the university's record.     Defendants clearly knew the content of the university's records, but the suppression of the record and the misleading representations about its content created false impressions in the jurors' minds.   Accordingly, without any means to rebut or show the defendants were lying about the content of the university's records, the plaintiff was "prevented" from "fully and fairly presenting his case at trial."   Federal Rules Civil Handbook, at 948; *Anderson,* 862 F.2d at 923, 926; *Lawrence*, 293 F.3d at 626.

139.    In addition to the  66 material misrepresentations, defendants deliberately failed to inform the jury that the limited evidence which was seen had been "expunged" from the plaintiff's university record as "misleading" and "inaccurate" under the federal law of FERPA.  In short, defendants allowed the jury to think the documents presented where an accurate assessment of the plaintiff's educational record, when, in fact, the university itself had "expunged" these records as "misleading" and "inaccurate" under FERPA.   Unquestionably, the defendants materially

misrepresented the status of the university's records, and the jury, without more, operated on the defendants' false impression of the records.

140.    The five areas of misrepresentation are presented below:

**M (1)   FRAUD DURING TESTIMONY ON DAMAGES (2 Tr. 12-20):**

**(1).    2 Tr. 11-16:   Doyle objected to, and moved to strike, plaintiff's testimony that he accepted "an adjunct professorship through the National Council of Churches and the Presbyterian Church to teach English in China."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0004-0009, 0015, 0026, 0035, 0045, 0177, 0349, 0421, 0480-481, 0600; see also Joint Pretrial Memo:    (1) Rev. Dr. Peter James (Presbyterian Church (USA) "PCUSA"); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), (4) Rev. Carter Hiestand (PCUSA), (4) David Harold, Manager, Overseas World Mission Prog., (NCCCUSA); (5) Rev. Steven Earl, Director, PCUSA Volunteer in Mission Program.*

**(2).    2 Tr. 14:7-15:   Doyle objected to, and moved to strike, plaintiff's testimony that his "loss of the adjunct professorship to the Beijing Foreign Affairs College in U.S. dollars probably would have been the equivalent to $14,000."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0015;  see also Joint Pretrial Memo:   (1) (PCUSA), David Harold, Manager, Overseas World Mission Prog., (NCCCUSA); (2) Rev. Steven*

*Earl, Director, PCUSA Volunteer in Mission Program; (3) Dr. Richard B. Edelman, Ph.D.*

*(economist and expert).*

**(3).     2 Tr. 15:8-16:   Doyle objected to, and moved to strike, plaintiff's testimony**

**that he had "$70,000 to $80,000 in student loans" which would be "deferred when [he]**

**became a chaplain."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.   See Suppressed Evidence 00895-1164;  see also Joint Pretrial*

*Memo:  (1) Charles McMillan, CAPT, U.S. Navy Chaplain Corps, PCUSA Council for Chaplains*

*and Military Personnel; (3) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate General,*

*Washington Navy Yard; (4) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S. Navy*

*Fiscal and Administrative Support; (5) Dr. Richard B. Edelman, Ph.D, economist and damages*

*expert.*

**(4).     2 Tr. 15:1-10:   Doyle objected to, and moved to strike, plaintiff's testimony**

**that he "lost [his] candidacy with the Presbyterian Church because [the university's] charges**

**were published to the Presbyterian Church."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.   See Suppressed Evidence 0044-57, 0064-71, 0082-84, 0158, 0170,*

*0179, 0215-217, 0221-222, 0243, 0353-355, 0480-481; see also Joint Pretrial Memo: (1) Rev. Dr.*

*Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand (PCUSA).*

**(5).    2 T. 6:13-16:  Doyle objected to, and moved to strike, plaintiff's testimony that as a consequence "of the charges that took place, [he] lost [his] candidacy with the church."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0044-57, 0064-71, 0082-84, 0158, 0170, 0179, 0215-217, 0221-222, 0243, 0353-355, 0480-481; see also Joint Pretrial Memo:   (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand (PCUSA).*

**(6).    2 Tr. 17:15-22:   Doyle objected to, and moved to strike, plaintiff's testimony on the "damages that [he] sustained from the allegations, the defamatory innuendos and charges that the University made to the Presbyterian Church."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0044-57, 0064-71, 0082-84, 0158, 0170, 0179, 0215-217, 0221-222, 0243, 0353-355, 370-371, 0402-413, 0480-481, 0679-685, 0715;  see also Joint Pretrial Memo:  (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand (PCUSA).*

**(7).    2 Tr. 18:2-7:    Doyle objected to, and moved to strike, plaintiff's testimony that these "damages can best be quantified by [the] loss of [his] commission . . . as a[Navy] lieutenant, [which] was about $30,000."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0010, 0018, 0191, 0196-205, 0244-245,0255, 0462-468, 0596-597; see also Joint Pretrial Memo:  (1) Charles McMillan, CAPT, U.S. Navy Chaplain Corps, PCUSA Council for Chaplains and Military Personnel; (2) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate General, Washington Navy Yard; (3) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S. Navy Fiscal and Administrative Support; (4) Dr. Richard B. Edelman, Ph.D, economist and damages expert.*

**(8).    2 Tr. 19:5-11:    Doyle objected to, and moved to strike, plaintiff's testimony that his "damages have continued because when [he] was at the White House [he] was forced to resign [his presidential appointment] because of these student loans."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 00895-1164; see also Joint Pretrial Memo:  (1) RADM Richard Hutchinson, Deputy Chief of Chaplains, USN Ret; (2) Charles McMillan, CAPT, U.S. Navy Chaplain Corps, PCUSA Council for Chaplains and Military Personnel; (3)  Rev. Dr. Peter James (PCUSA); (4) Rev. Ruth Rheinhold (PCUSA), (5) Rev. Dr. Ruth Herr (PCUSA), and (6) Rev. Carter Hiestand (PCUSA); see also Joint Pretrial Memo: Defendants (7) Dwayne Huebner, (8) Dottie Robinson and (9) William Stempel.*

**(9).     2 Tr. 19:16-21:   Doyle objected to, and moved to strike, plaintiff's testimony that he was "damaged by what the University said and did" and this resulted in the "loss of his [Navy] commission."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0010, 0018, 0191, 0196-205, 0244-245, 0255, 0462-468, 0480-481, 0596-597; see also Joint Pretrial Memo:  (1) RADM Richard Hutchinson, Deputy Chief of Chaplains, USN Ret; (2) Charles McMillan, CAPT, U.S. Navy Chaplain Corps, PCUSA Council for Chaplains and Military Personnel; (3) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate General, Washington Navy Yard; (4) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S. Navy Fiscal and Administrative Support; (5) Dr. Richard B. Edelman, Ph.D, economist and damages expert.*

**(10).     2 Tr. 19:16-25:   Doyle objected to, and moved to strike, plaintiff's testimony that the "ballpark figure as to what [his] damages are," was because he "lost [his Navy] commission" and was not able "to undertake a career in the undertaking that [he] wanted to do."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0010, 0018, 0191, 0196-205, 0244-245, 0255, 0462-468, 0596-597;  see also Joint Pretrial Memo:  (1) RADM Richard Hutchinson, Deputy Chief of Chaplains, USN Ret; (2) Charles McMillan, CAPT, U.S. Navy Chaplain Corps, PCUSA*

*Council for Chaplains and Military Personnel; (3)  Rev. Dr. Peter James (PCUSA); (4) Rev. Ruth*

*Rheinhold (PCUSA), (5) Rev. Dr. Ruth Herr (PCUSA), and (6) Rev. Carter Hiestand (PCUSA).*

### M (2)   FRAUD ON PLAINTIFF'S CLOSING ARGUMENT (2 Tr. 44-79):

**(11).    2 Tr. 48-49:9:  Doyle objected to, and moved to strike, plaintiff's testimony on
the allegation that he had been "dismissed from the American Baptist Church because of
moral turpitude."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.  See Suppressed Evidence 0049-51, 0081-192, 0353, see also Joint*

*Pretrial Memo:  (1)  Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev.*

*Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand (PCUSA).*

**(12.)    2 Tr. 49:12-20:   Doyle objected to, and moved to strike, plaintiff's testimony
that Dittes told the "Candidates' Committee [of the PCUSA] that [the plaintiff] lied about his
father's death."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.  See Suppressed Evidence 0012-13, 0053, 0056, 0057-63, 0176,*

*0349-350; see also Joint Pretrial Memo:  (1)  Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth*

*Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand (PCUSA).*

**(13).   2 Tr. 50:21-25:   Doyle objected to, and moved to strike, plaintiff's testimony that he was "told by the university to submit proof that [he] had mailed these essays from the hotel just prior to [his] leaving for [Navy] service in the Mediterranean."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0014, 0016-18, 0175, 0357;  see also Joint Pretrial Memo: Defendant Lansing Hicks.*

**(14).   2 Tr. 18-22:   Doyle objected to, and moved to strike, plaintiff's testimony that "at the final hearing that took place [he] submitted all of [his] documentation from the Navy showing that [his] Navy travel voucher was proper and accurate."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0010-13, 0171-0211, 0255, 0402-495, 0502-526, 0596-97, 0659-661;  see also Joint Pretrial Memo:  (1)  Jonathon Iseallo, CAPT, USN, Office of Judge Advocate General, Washington Navy Yard; (2) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S. Navy Fiscal and Administrative Support.*

**(15).   2 Tr. 51-52:1-5:   Doyle objected to, and moved to strike, plaintiff's testimony that he "was cleared from that charge of fraud on Navy documents."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0211-12, 0255, 0402-495, 0502-526, 0596-*

*97, 0659-661; see also Joint Pretrial Memo:  (1) RADM Richard Hutchinson, Deputy Chief of*

*Chaplains, USN Ret; (2) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate General,*

*Washington Navy Yard; (3) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S. Navy*

*Fiscal and Administrative Support.*

**(16).    2 Tr. 53-54:1-9:   Doyle objected to, and moved to strike, plaintiff's testimony**

**that Dittes alleged the plaintiff was a "psychopath" and that this document was in the**

**plaintiff's "student record" and "published to the Presbyterian Church."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.  See Suppressed Evidence 0044, 0049-55, 0072-80, 0159-162, 0402-*

*495; see also Joint Pretrial Memo:  (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold*

*(PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand (PCUSA).*

**(17).    2 Tr. 56:9-14:   Doyle objected to, and moved to strike, plaintiff's testimony that**

**Dittes claimed the plaintiff  did not "disclose his address presumably as a way of avoiding**

**several former landlords who have claims of unpaid rent."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.  See Suppressed Evidence 0049-55, 0072-8, 0159-162, 0171-210,*

*0213-234, 0246-252, 0402-495; see also Joint Pretrial Memo:  (1)  Rev. Dr. Peter James (PCUSA);*

*(2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand*

*(PCUSA).*

**(18).    2 Tr. 56:17-18:    Doyle objected to, and moved to strike, plaintiff's testimony that Dittes told the Candidates' Committee that he plaintiff "was a fugitive from the law."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0044, 0049-55, 0072-80, 0159-162, 0171-210, 0213-234, 246-0252, 0256-261, 0269-274, 0287-291, 294, 326, 0402-495; see also Joint Pretrial Memo: (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and (4) Rev. Carter Hiestand (PCUSA).*

**(19).    2 Tr. 56:20-25:    Doyle objected to, and moved to strike, plaintiff's testimony that Dittes alleged that the plaintiff submitted an affidavit "bearing totally different signatures."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; see also Joint Pretrial Memo: (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David Speilberg, Ph.D. Notary Public (Connecticut).*

**(20).    2 Tr. 57:8-14:    Doyle objected to, and moved to strike, plaintiff's testimony that he allegedly "attain[ed] and submit[ed] falsified documents in support of his claim that his papers were completed by August 11th."**

Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Norman S. Kiger, General Counsel, U.S. Naval Investigative Service Command, (5) John P. Osborne (FBI Special Agent Retired); (6) Elaine Pagliaro, Director, Connecticut State Police Forensic Laboratory; Lawrence Maxwell, Fraud and Prohibited Mailing Branch, Office of Criminal Investigations, U.S. Postal Service.

**(21).    2 Tr. 58:8-20:    Doyle objected to, and moved to strike, plaintiff's testimony that two university deans "agreed that they would not provide [the plaintiff] notice" on the professor's allegations.**

Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0045-46, 0157, 0164-166, 0167-169, 0170-210, 0213-234, 0235-237, 0238-242, 0243-245, 0253-54, 0262-268, 0345, 0347-364, 0370-382, 0383-387, 0497-501, 0533-543, 0563-574, 0598-678; see also Joint Pretrial Memo: Defendants (1)

*Dwayne Huebner, (2) James Dittes, (3) Lansing Hicks, (4) Dottie Robinson and (5) William*

*Stempel.*

**(22).    2 Tr. 59:1-8:    Doyle objected to, and moved to strike, plaintiff's testimony that the University withheld charges for "eight months after Professor Dittes had filed this letter on October 12, 1990."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237; see also Joint Pretrial Memo: (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and Defendants (3) Dwayne Huebner, (4) James Dittes, (5) Lansing Hicks, (6) Dottie Robinson and (7) William Stempel.*

**(23)    2 Tr. 60:7-17:    Doyle objected to, and moved to strike, plaintiff's testimony that it took the University "a year and a half later" after charges had been submitted, and that "none of the documents that [plaintiff] had submitted" were provided to the committee for its hearing.**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237, 0402-495, 0497-501, 0530-562, 0563-574; see also Joint Pretrial Memo: Defendants (1) Dwayne Huebner, (2) James Dittes, (3)*

*Harry Adams, (4) Dottie Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher,*

*(8) Lee McGee, (9) Laura Lyon, and (10) George Lindbeck.*

**(24).    2 Tr. 6:20-63:3:    Doyle objected to, and moved to strike, plaintiff's testimony**

**that the University's rules provide that in "hearings involving potential criminal cases, the**

**student may have a lawyer present at the hearing," but that plaintiff was "denied an**

**attorney."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.  See Suppressed Evidence 253-254, 0402-495, 0497-510, 0530-562,*

*0563-574; see also Joint Pretrial Memo: Defendants (1) Dwayne Huebner, (2) James Dittes, (3)*

*Lansing Hicks, (4) Dottie Robinson and (5) William Stempel.*

**(25).    2 Tr. 63:17-22:    Doyle objected to, and moved to strike, the plaintiff's**

**testimony that none of his exculpatory evidence was ever presented to the committee "in**

**violation of the committee's own rules."**

*Plaintiff was prevented from proving the truth of this statement because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.  See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-*

*166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237, 0402-495, 0497-501, 0530-562,*

*0563-574; see also Joint Pretrial Memo:  Defendants (1) Dwayne Huebner, (2) James Dittes, (3)*

*Harry Adams, (4) Dottie Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher,*

*(8) Lee McGee, (9) Laura Lyon, and (10) George Lindbeck*

(26).     **2 Tr. 66:7-18:     Doyle objected to, and moved to strike, plaintiff's testimony that the professor alleged that "there was fraud or forgery on various affidavits," which "are crimes under Connecticut and federal law," and that these charges were "placed in [the plaintiff's] student record."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; see also Joint Pretrial Memo:   (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Norman S. Kiger, General Counsel, U.S. Naval Investigative Service Command, (5) Elaine Pagliaro, Director, Connecticut State Police Forensic Laboratory; (6) Lawrence Maxwell, Fraud and Prohibited Mailing Branch, Office of Criminal Investigations, U.S. Postal Service.*

(27).     **2 Tr. 72:73:1-5:  Doyle objected to, and moved to strike, plaintiff's testimony that he did not "get notice for eight months . . . almost an entire academic year."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237; see also Joint Pretrial Memo:   (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr*

*(PCUSA), and Defendants (3) Dwayne Huebner, (4) James Dittes, (5) Lansing Hicks, (6) Dottie*
*Robinson and (7) William Stempel.*

**(28).  2 Tr. 77:6-12:  Doyle objected to, and moved to strike, plaintiff's testimony that**
**he is on medication "on Wellbutrin, Prozac, and Klonapin . . . . to try and deal with the**
**depression from having lost these positions [with the Navy, the Presbyterian Church and the**
**Beijing Foreign Affairs College.]"**

*Plaintiff was prevented from proving the truth of this statement because the Court*
*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*
*witnesses and the defendants.  See Suppressed Evidence 004-9, 0010, 10015, 0017-18, 0035, 0253-*
*255, 0262-268, 0345, 0347-364, 0370-382, 0391-398, 0402-495; see also Joint Pretrial Memo: (1)*
*Harold Barbot, M.D., (2) Gilbert Kliman, M.D., (3) Harold Skopek, M.D., (4) Elizabeth Teegarden,*
*Ph.D., and (5) Ulrich Prinz, M.D.*

**(29).  2 Tr. 79:1-4:  Doyle objected to, and moved to strike, plaintiff's testimony that**
**the university could not have acted properly because the professor's charges went  "on for**
**three years."**

*Plaintiff was prevented from proving the truth of this statement because the Court*
*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*
*witnesses and the defendants.  See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0081-159,*
*0164-166, 0167-169, 0171-210, 0213-234, 0235-237, 0238-242, 243, 0244-245, 0246-252, 0253-*
*54, 0255, 0256-261, 0262-268, 0269-284, 0285-286, 0313-343, 0345, 0347-364, 0370-382, 0383-*
*387, 0391-397, 0402-495, 0497-501, 0502-526, 0530-532, 0533-562, 0563-574, 575-595, 598-678;*

*see also Joint Pretrial Memo:  (1)  Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold*
*(PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and Defendants (1) Dwayne Huebner, (2) James*
*Dittes, (3) Harry Adams, (4) Lansing Hicks,(5)  Dottie Robinson and (6) William Stempel.*

## M  (3)  FRAUD DURING DEFENDANTS' CLOSING ARGUMENT (2 Tr. 80-113)

**(30)     2 Tr. 83:19-2:   Doyle misinformed the jury that "Yale acted entirely**
**appropriately consistent with their obligations."**

*In fact, a review of the records and rules of the university show that the university had not*
*acted "entirely consistent with their obligations."   The plaintiff was prevented from proving the*
*truth of this statement because the Court suppressed 90% of the university's records and precluding*
*testimony from defendants and plaintiff's witnesses and experts.   See Suppressed Evidence 0045-*
*46, 0064-71, 0072-80, 0081-159, 0164-166, 0167-169, 0171-210, 0213-234, 0235-237, 0238-242,*
*243, 0244-245, 0246-252, 0253-54, 0255, 0256-261, 0262-268, 0269-284, 0285-286, 0313-343,*
*0345, 0347-364, 0370-382, 0383-387, 0391-397, 0402-495, 0497-501, 0502-526, 0530-532, 0533-*
*562, 0563-574, 575-595, 598-678; see also Joint Pretrial Memo:  (1)  Rev. Dr. Peter James*
*(PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and Defendants (4)*
*Dwayne Huebner,(5)  James Dittes, (6) Harry Adams,(7)  Lansing Hicks, (8) Dottie Robinson and*
*(9) William Stempel.*

**(31)     2 Tr. 85:13-19:   Doyle misinformed the jury that showed "it was three months**
**later" when "Mr. Tibbetts had a conversation with Mr. Dittes."**

*The plaintiff was prevented from proving the truth of this statement because the Court*
*suppressed 90% of the university's records and precluded testimony from both the defendants and*

*plaintiff's witnesses and experts.   See Suppressed Evidence 0014, 0016-20, 0021-22, 0025, 0028-*
*34, 0045, 0171-210, 0213-234, 0383-387, 0402-495, 0598-678; see also Joint Pretrial Memo:*
*Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Harry Adams, (4) Lansing Hicks.*

**(32).    2 Tr. 86: 13-21:  Doyle misinformed the jury that the plaintiff submitted**
**documents in "December of 1989."**

*In fact, plaintiff had submitted these records in October 1989.  Plaintiff was prevented from*
*proving the truth of this statement because the Court suppressed 90% of the university's records*
*and precluded testimony from the plaintiff's witnesses and the defendants.   See Suppressed*
*Evidence 0014, 0016-20, 0021-22, 0025, 0028-34, 0045, 0171-210, 0213-234, 0383-387, 0402-495,*
*0598-678; see also Joint Pretrial Memo:   Defendants (1) Dwayne Huebner, (2) James Dittes, (3)*
*Harry Adams, (4) Lansing Hicks.*

**(33).    2 Tr. 87-88:1-5:  Doyle misinformed the jury that "there is serious questions**
**about the veracity of when Mr. Tibbetts . . . mailed those things."**

*In fact, plaintiff answered all of the "serious questions" but university officials withheld this*
*exculptory evidence from the PSC.  Plaintiff was prevented from proving the truth of this statement*
*because the Court suppressed 90% of the university's records and precluded testimony from  the*
*plaintiff's witnesses and the defendants.   See Suppressed Evidence 0045-46, 0064-71, 0072-80,*
*0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237, 0402-495, 0497-501,*
*0530-562, 0563-574; see also Joint Pretrial Memo: Defendants (1) Dwayne Huebner, (2) James*
*Dittes, (3) Harry Adams, (4) Dottie Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris*
*Bucher, (8) Lee McGee, (9) Laura Lyon, and (10) George Lindbeck.*

**(34).    2 Tr. 89:8-18   Doyle misinformed the jury that plaintiff "wait[ed]nearly two months, that is until December" to submit the essays.**

*In fact, plaintiff had submitted the essays on October 17, 1989.   Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0014, 0016-20, 0021-22, 0025, 0028-34, 0045, 0171-210, 0213-234, 0383-387, 0402-495, 0598-678; see also Joint Pretrial Memo:   Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Harry Adams, (4) Lansing Hicks.*

**(35).   2 Tr. 91: 1-7:   Doyle misinformed the jury that there were "discrepancies which may or might not be relevant between [plaintiff's] travel log and expense account to the Navy."**

*In fact, the U.S. Naval Investigative Service Command (NISCOM) verified that there was no discrepancy on the plaintiff's travel logs, but university officials withheld this U.S. Government report from the members of the Professional Studies Committee.   Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0010-13, 0171-0211, 0191, 0196-205, 0244-245, 0255, 0402-495, 0502-526, 0596-97, 0659-661;  see also Joint Pretrial Memo:  (1) Norman S. Kriger, NISCOM General Counsel, Washington Navy Yard, (2) RADM Richard Hutchinson, Deputy Chief of Chaplains, USN Ret; (3) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate General, Washington Navy Yard; (4) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S. Navy Fiscal and Administrative Support; (5) Dr. Richard B. Edelman, Ph.D, economist and damages expert.*

**(36).  2 Tr. 91:8-11:  Doyle misinformed the jury that there was a question about "an envelope and stamp" from a "hotel desk" on the plaintiff's documents.**

*In fact, there was a letter and affidavit from Russell Raymond, Hotel Clerk, Wilmington Hilton Hotel, who verified that he mailed these essays, but university officials withheld this information from the members of the PSC committee.   Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237, 0402-495, 0497-501, 0530-562, 0563-574; see also Joint Pretrial Memo: Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Harry Adams, (4) Dottie Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher, (8) Lee McGee, (9) Laura Lyon, and (10) George Lindbeck.*

**(37).  2 Tr. 93: 2-15:  Doyle misinformed the jury that Dittes raised questions about when the essays were submitted "in a chance hallway encounter October 17."**

*In fact, the evidence shows that five individuals had submitted letters and affidavits verifying that plaintiff had timely mailed his essays on August 10, 1989, but that university officials withheld this information from the PSC hearing.  Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0014, 0016-20, 0021-22, 0025, 0028-34, 0045, 0171-210, 0213-234, 0383-387, 0402-495, 0598-678; see also Joint Pretrial Memo:  Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Harry Adams, (4) Dottie*

*Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher, (8) Lee McGee, (9) Laura*

*Lyon, and (10) George Lindbeck.*


**(38).    2 Tr. 94:17-20:    Doyle misinformed the jury that Dittes raised questions when**
**"duplicates" were provided two months later in December 1989.**

*In fact, plaintiff had the preponderance of evidence (five affidavits and five letters) that his*

*essays had been timely submitted.   However, university officials withheld these five affidavits and*

*letters from the PSC hearing.  Plaintiff was prevented from proving the truth of this statement*

*because the Court suppressed 90% of the university's records and precluded testimony from both*

*the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0014, 0016-20, 0021-22,*

*0025, 0028-34, 0045, 0171-210, 0213-234, 0383-387, 0402-495, 0598-678; see also Joint Pretrial*

*Memo:  Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Harry Adams, (4) Dottie Robinson,*

*(5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher, (8) Lee McGee, (9) Laura Lyon, and*

*(10) George Lindbeck.*


**(39).    2 Tr. 95:15-24:    Doyle misinformed the jury that there were questions about**
**"affidavits" and whether they were "signed and notarized."**

*In fact, these "affidavits" where investigated by two questioned document examiners*

*(former FBI and Secret Service) who issued reports as to their veracity, but university attorneys*

*withheld these documents from the PSC committee.   Plaintiff was prevented from proving the truth*

*of this statement because the Court suppressed 90% of the university's records and precluded*

*testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0036,*

*0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387,*

*0402-495, 0533-562, 0598-678, 0679-700; see also Joint Pretrial Memo:  (1) Chief James Perroti,*

*Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin*

*Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia*

*M. Raymond, (6) David Speilberg, Ph.D. Notary Public (Connecticut).*

**(40).     2 Tr. 96:3-12:   Doyle misinformed the jury that "Raymond's signature on the**

**April 26 document is significantly different from that on the letter of January 15."**

*In fact the reason for that signature discrepancy was because Russell Raymond's mother*

*signed the document for her son, but university officials withheld this exculpatory evidence from the*

*PSC Committee.   Plaintiff was prevented from proving the truth of this statement because the*

*Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants. See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162,*

*0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678,*

*0679-700; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2)*

*Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S.*

*Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David*

*Speilberg, Ph.D. Notary Public (Connecticut).*

**(41).     2 Tr. 96:22-25:   Doyle misinformed the jury that there were discrepancies in**

**the way the plaintiff "collect[ed] the affidavits."**

*In fact, there was no discrepancy and retired FBI and U.S. Secret Service questioned*

*document examiners verified to university officials that there were no discrepancies.   But*

*university officials withheld their report from the PSC.   Plaintiff was prevented from proving the*

*truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; see also Joint Pretrial Memo: (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David Speilberg, Ph.D. Notary Public (Connecticut); and Defendants (7) Dwayne Huebner, (8) James Dittes, (9) Lansing Hicks, (10) Dottie Robinson and (11) William Stempel.*

**(42).    2 Tr. 98:7-22: Doyle misinformed the jury that there were alleged discrepancies in the "prepar[ation]" and "collect[ion]" of the plaintiff's affidavits.**

*In fact, each of these individuals had signed and notarized these affidavits themselves and their signatures were verified by questioned document examiners from the FBI and U.S. Secret Service. However, university officials withheld this information from the members of the PSC. Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; see also Joint Pretrial Memo: (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David Speilberg, Ph.D. Notary Public (Connecticut); and Defendants (7) Dwayne Huebner, (8) James Dittes, (9) Lansing Hicks, (10) Dottie Robinson and (11) William Stempel.*

**(43).    2 Tr. 99:3-6:  Doyle misinformed the jury that "Huebner is quoted as saying that he had not seen documents relating to the fraud charges."**

In fact, internal university memoranda showed that Defendants Huebner and Dittes discussed these fraud charges prior to October 1990.   But plaintiff had been prevented from proving the truth of this statement because the Court had suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0045-46, 0157-158, 0164-169, 0171-210, 023-234, 0235-237, 0391-397, 0383-387, 0497-501, 0502-526, 0533-562, 0563-574, 0575-595, 0598-678; see also Joint Pretrial Memo: Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Lansing Hicks, (4) Dottie Robinson and (5) William Stempel.

**(44).    2 Tr. 99:7-19:  Doyle misinformed the jury that "there were no fraud charges pending on April 19, 1990, the date [the plaintiff] cites as the date that he had the problems with the Presbyterian Church."**

In fact, Huebner and Dittes agreed not to file these alleged fraud charges until they had published them to the plaintiff's candidates' committee of the Presbyterian Church.   Accordingly, plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0049-55, 0064-71, 0157-158, 0164-166, 0167-169, 0170-210, 0213-234, 0235-237, 0243-245, 0255, 0256-261, 0598-678; see also Joint Pretrial Memo:  (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr

*(PCUSA), and Defendants (4) Dwayne Huebner, (5) James Dittes, (6) Lansing Hicks, (7) Dottie Robinson and (8) William Stempel.*

**(45.)    2 Tr. 99-100:1-2:  Doyle misinformed the jury that "in November 1990 the Presbyterian Church set eight requirements to be met by March 1991 by Mr. Tibbetts . . . only one of which was related to the Yale Divinity School."**

*In fact, all eight of these requirements were a direct result of defamatory publications by Huebner and Dittes to the Presbyterian Church.   Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0049-55, 0064-71, 0081-159, 0164-166, 0167-169, 0170-210, 0213-234, 0235-237, 0243-245, 0255, 0256-261, 0598-678; see also Joint Pretrial Memo:  (1)  Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and Defendants (4) Dwayne Huebner, (5) James Dittes, (6) Lansing Hicks, (7) Dottie Robinson and (8) William Stempel.*

**(46).    2 Tr. 100:3-11:  Doyle misinformed the jury that the reason in 1991 that the plaintiff "was not allowed to continue the studies to be a Presbyterian minister were that he failed to comply with eight requirements that the Presbyterian Church insisted upon only one of which was the resolutions of these charges at Yale.  Only one."**

*In fact, in December 1989, plaintiff was scheduled to become an ordained minister when the university published these eight defamatory publications to the plaintiff's church committee. Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0049-55, 0064-71, 0081-159, 0164-166, 0167-169, 0170-*

63

*210, 0213-234, 0235-237, 0243-245, 0255, 0256-261, 0598-678; see also Joint Pretrial Memo:  (1) Rev. Dr. Peter James (PCUSA); (2) Rev. Ruth Rheinhold (PCUSA), (3) Rev. Dr. Ruth Herr (PCUSA), and Defendants Dwayne Huebner, James Dittes, Lansing Hicks, Dottie Robinson and William Stempel.*

**(47).   2 Tr. 100-101:1-13:   Doyle misinformed the jury that plaintiff's affidavit from Claudia Fabricant with her signature allegedly notarized "was not notarized."**

*In fact, the Fabricant affidavit affirmed that the plaintiff had timely submitted his essays, and the notary public confirmed this signature, and a former FBI questioned document examiner verified the authenticity of this document to the university; but university officials withheld this information from the members of the PSC.   Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0037, 017-210, 0213-234, 0391-397, 0402-495, 0598-678; see also Joint Pretrial Memo: (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Claudia Fabricant, (6) David Speilberg, Ph.D. Notary Public (Connecticut); and Defendants (5) Dwayne Huebner, (6) James Dittes, (7) Lansing Hicks, (8) Dottie Robinson and (9) William Stempel.*

**(48).   2 Tr. 102:1-7:   Doyle misinformed the jury that there was a discrepancy over "the signature of Mr. Russell J. Raymond . . . on a letter, and on a affidavit."  Doyle went on to tell the jury:   "Professor Dittes and Professor Hicks raise questions saying those aren't the same signatures, raise questions about whether they were being deceived.  Now, this is a**

serious matter, at any educational institution . . . . And there was serious questions raised about this."

In fact, the signature discrepancy had been caused by Jean M. Raymond, the mother of Russell J. Raymond. This letter and affidavit was investigated and verified by a former FBI Questioned Document Examiner, who reported that there was no discrepancies to the university. The university withheld this information from the PSC and defendant Doyle deliberately misled the jury about this information. Accordingly the plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both plaintiff's witnesses and defendants. See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; see also Joint Pretrial Statement: (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David Speilberg, Ph.D. Notary Public (Connecticut).


(49).   2 Tr. 102-103:17-21:  Doyle misinformed the jury that "there is a process at Yale Divinity School and Yale University for dealing with matters where there are questions, of whether there's fraud, or dishonesty, and because Professor Dittes had . . . [a] serious question about the veracity of what Mr. Tibbetts was telling him, that the issue was referred to the committee, which is the Professional Studies Committee.   I think that's it, PSC."

In fact, university officials put this criminal matter of fraud before an academic committee, rather than a disciplinary committee, in order to deny plaintiff representation by an attorney. The university's actions contradicted published rules on this matter.   Accordingly, plaintiff was

*prevented from proving the truth of this statement because the Court suppressed 90% of the*

*university's records and precluded testimony from plaintiff's witnesses and defendants.   See*

*Suppressed Evidence 0014, 0027-34, 0045-46, 0157, 0159-162, 0164-166, 0167-169, 0171-210,*

*0213-234, 0235-237, 0238-242, 243, 244-245, 246, 252, 253-54, 255, 256-261, 262-268, 269-284,*

*0285-286, 0345, 0347-364, 0383-387, 0391-397, 0402-495, 0497-501, 0502-526, 0563-574, 0598-*

*678, 0700-718; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department;*

*(2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S.*

*Secret Service Document Examiner);  Defendants (4) Rick Levin, (5) Dwayne Huebner, (6) James*

*Dittes, (7) Lansing Hicks, (8) Penelope Laurens, (9) Dottie Robinson and (10) William Stempel.*


**(50).   2 Tr. 103:15-21:    Doyle misinformed the jury that "the charge was lodged**

**with the appropriate committee at Yale Divinity School to deal with the issue" and that "one**

**of the things [the plaintiff] claims that we did wrong is that somehow we, Yale, Dittes, Hicks, I**

**don't know, delayed the resolution of this issue once it was put in front of the committee that**

**had jurisdiction to deal with it."**

*In fact, Defendant Penelope Laurans, Director of the Yale Summer School, admitted that the*

*matter should have been put before the jurisdiction of Yale College because this was a Yale College*

*course, not a Yale Divinity School course.   Moreover, Yale's in-house counsel told Huebner and*

*Dittes to investigate these charges, but both declined to contact the proper law enforcement*

*agencies.   Because Yale refused to investigate its criminal charges before an academic committee,*

*plaintiff was forced to hire retired question document examiners from the FBI and U.S. Secret*

*Service to refute the university's spurious criminal charges. To this end, plaintiff was prevented*

*from proving the truth of these statements because the Court suppressed 90% of the university's*

*records and precluded testimony from plaintiff's witnesses and the defendants. See Suppressed*

*Evidence 0014, 0027-34, 0045-46, 0157, 0159-162, 0164-166, 0167-169, 0171-210, 0213-234,*

*0235-237, 0238-242, 243, 244-245, 246, 252, 253-54, 255, 256-261, 262-268, 269-284, 0285-286,*

*0345, 0347-364, 0383-387, 0391-397, 0402-495, 0497-501, 0502-526, 0563-574, 0598-678, 0700-*

*718; see also Joint Pretrial Memo, Defendants (1) Rick Levin, (2) Dwayne Huebner, (3) James*

*Dittes, (4) Lansing Hicks, (5) Penelope Laurens, (6) Dottie Robinson and (7) William Stempel.*


**(51).    2 Tr. 104: 7-12:    Doyle misinformed the jury that Huebner had expressed**
**frustration "about the divinity school's . . . inability to come to grips with this thing because of**
**[the plaintiff's] lack of cooperation."**

*In fact, the "committee's inability to come to grips with this thing" was because Huebner*

*had placed this criminal matter before an academic committee, and he refused to have the Yale*

*Police and other law enforcement agencies investigate the matter of Dittes' charges fraud and*

*forgery on notarized affidavits.  Accordingly, plaintiff was prevented from proving the truth of these*

*statements because the Court suppressed 90% of the university's records and precluded testimony*

*from plaintiff's witnesses and the defendants.   See Suppressed Evidence 0027-34, 0171-210, 0213-*

*234, 0243, 0246-252, -253-54, 255, 256-261, 0262-268, 0269-284, 0383-387, 0391-397, 0402-495,*

*0598-678; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2)*

*Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S.*

*Secret Service Document Examiner); (4) Norman S. Kiger, General Counsel, U.S. Naval*

*Investigative Service Command, (5) Elaine Pagliaro, Director, Connecticut State Police Forensic*

*Laboratory; (6) Lawrence Maxwell, Fraud and Prohibited Mailing Branch, Office of Criminal*

*Investigations, U.S. Postal Service.*

**(52).   2 Tr. 105:15-24:   Doyle misinformed the jury that Huebner stated this "is a disciplinary case involving a charge of attempted fraud . . . .  As you have been told repeatedly, this charge is not a criminal violation, and there is no possibility of any criminal charge in connection with this case."**

*In fact, this statement was written by William Stempel, Yale's Deputy General Counsel. Further, this statement contradicted the statements of James Perroti, Chief of Yale Police, who stated the charges were criminal in nature.   This statement was supported by Clarence Bohn, J.D. (Retired FBI Document Examiner), Norman S. Kiger, General Counsel, U.S. Naval Investigative Service Command, and (5) Elaine Pagliaro, Director, Connecticut State Police Forensic Laboratory.   Yale's charges were clearly criminal in nature and plaintiff was "prevented" from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from plaintiff's witnesses and defendants.   See Suppressed Evidence 0049-50, 0072-80, 0157-162, 0164-166, 0167-169, 0170-210, 0213-234, 0235-237, 0238-242, 0244-245, 0246-252, 0253-54, 255, 0256-261, 0269-284, 0383-387, 0402-495, 0598-678; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Norman S. Kiger, General Counsel, U.S. Naval Investigative Service Command, (5) Elaine Pagliaro, Director, Connecticut State Police Forensic Laboratory; (6) Lawrence Maxwell, Fraud and Prohibited Mailing Branch, Office of Criminal Investigations, U.S. Postal Service.*

**(53).   2 Tr.  16:13-21:   Doyle misinformed the jury that the plaintiff "claimed that he was entitled to a lawyer and not allowed to have a lawyer, and he quoted to you, he misquoted to you, the rules that applied in these circumstances."**

*In fact, the university charged the plaintiff with "fraud" and "attempted fraud" with notarization of affidavits, as well as fraud on U.S. Navy travel documents. These are clearly criminal charges under both federal and state law. Moreover, the Disciplinary Committee Rules clearly provide that "In hearings involving potential civil or criminal cases, the student may have a lawyer present at the hearing." Admitted Evidence 36 (exhibit). Yet, in this "potential criminal case," the university refused to allow the plaintiff to "have a lawyer present at the hearing." Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence See Suppressed Evidence 253-254, 0402-495, 0497-51, 0530-562, 0563-574; see also Joint Pretrial Memo: (1) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate General, Washington Navy Yard; (2) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S. Navy Fiscal and Administrative Support; (3) Norman S. Kiger, General Counsel, U.S. Naval Investigative Service Command, (4) John P. Osborne (FBI Special Agent Retired); (5) Elaine Pagliaro, Director, Connecticut State Police Forensic Laboratory; (6) Lawrence Maxwell, Fraud and Prohibited Mailing Branch, Office of Criminal Investigations, U.S. Postal Service; (7) Dr. Richard B. Edelman, Ph.D, economist and damages expert; (8) Chief James Perroti, Yale Police Department; (9) Clarence Bohn, J.D. (Retired FBI Document Examiner); (10) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (11) David Speilberg, Ph.D. Notary Public (Connecticut).*

**(54). 2 Tr. 109-111:1-7: Doyle misinformed the jury about the Minutes of the PSC: "'did [plaintiff] obtain and submit falsified documents in support of his claim that his papers were completed by August 11, 1989?' Two members of the committee agreed with Professor**

**Dittes' view, that he had submitted a false affidavit, three people voted no, that it didn't rise to the level of fraud, and one abstained."**

*In fact, university officials had withheld all of the plaintiff's exculpatory evidence from the PSC which would have shown that the signature discrepancy between the affidavit and letter of Russell J. Raymond, was the signature of Mrs. Jean Raymond, the mother of Russell Raymond. This fact was verified by retired FBI and U.S. Secret Service questioned document examiners, each of whom had submitted independent reports to the university showing there was no "falsified documents." Thus the PSC votes were not based upon the plaintiff's exculpatory evidence, because officials withheld this evidence from the PSC. Plaintiff was prevented from proving the truth of these statements because the Court had suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0502-526, 0530-532; see also Joint Pretrial Memo: Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Harry Adams, (4) Dottie Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher, (8) Lee McGee, (9) Laura Lyon, and (10) George Lindbeck.*

**(55).    2 Tr. 110:15-21:    Doyle misinformed the jury that "the questions raised by Professor Dittes, by Lansing Hicks, and by the University concerning the veracity of what [the plaintiff] was telling them about the mailing of those papers were legitimate concerns. It appeared that they were being lied to, and that the affidavits were phony.   That's what it appeared to be."**

*In fact, plaintiff had submitted all of the necessary evidence to disprove that these affidavits were "phony." Plaintiff was prevented from proving the truth of these statements because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.   See Suppressed Evidence 0049-55, 0072-80, 0157, 0158, 0159-162,*

*0164-166, 0167-169, 0170, 0171-210, 0213-234, 0235-237, 0238-242, 0243, 0244-45, 0246-252,*

*0253-54, 0255, 0256-261, 0262-268, 0269-284, 0285-286, 0294-326, 0345, 0347-364, 0370-382,*

*0282-38, 0402-495, 0497-501, 0502-526, 0530-532, 0533-562, 0563-574, 0575-595, 0679-700,*

*0701-718; see also Joint Pretrial Memo:  (1) Jonathon Iseallo, CAPT, USN, Office of Judge*

*Advocate General, Washington Navy Yard; (2) Dennis Oppman, Deputy Asst., Judge Advocate*

*General, U.S. Navy Fiscal and Administrative Support; (4) Chief James Perroti, Yale Police*

*Department; (5) Clarence Bohn, J.D. (Retired FBI Document Examiner); (6) Edwin Alford, MFS,*

*(Retired U.S. Secret Service Document Examiner); (7) Russell J. Raymond, (8) Julia M. Raymond,*

*(9) David Speilberg, Ph.D. Notary Public (Connecticut); (10) Norman S. Kiger, General Counsel,*

*U.S. Naval Investigative Service Command, (11) John P. Osborne (FBI Special Agent Retired);*

*(12) Elaine Pagliaro, Director, Connecticut State Police Forensic Laboratory; (13) Lawrence*

*Maxwell, Fraud and Prohibited Mailing Branch, Office of Criminal Investigations, U.S. Postal*

*Service; (14) Dwayne Huebner, (15) James Dittes, (16) Harry Adams, (17) Dottie Robinson, (18)*

*William Stempel, (19) Detra MacDougal, (20) Chris Bucher, (21) Lee McGee, (22) Laura Lyon,*

*(23) George Lindbeck, and (24) Penelope Laurens.*


**(56).    2 Tr. 111:16-20:   Doyle misinformed the jury that the PSC Minutes "is not, as**
**[the plaintiff] claims, an exoneration of him.   It's not that all.   What it is responsible people**
**shifting through different pieces of evidence and coming and viewing it and coming to a**
**conclusion.   That's what this was about."**

*In fact, the evidence showed that  university officials "shif[ed] through different pieces of*

*evidence" to withhold  damaging pieces of evidence from the PSC..   It was the way the university*

*handled this matter that provided the fraud claim on the PSC Minutes, which is pled as Count 12 in*

*Tibbetts v. Levin.   Defendants compounded this matter by withholding these PSC Minutes from a*

*federal jury.  Plaintiff was prevented from proving the truth of these statements because the Court*

*suppressed 90% of the university's records and precluded testimony from both the plaintiff's*

*witnesses and the defendants.  See Suppressed Evidence 0049-55, 0072-80, 0157, 0158, 0159-162,*

*0164-166, 0167-169, 0170, 0171-210, 0213-234, 0235-237, 0238-242, 0243, 0244-45, 0246-252,*

*0253-54, 0255, 0256-261, 0262-268, 0269-284, 0285-286, 0294-326, 0345, 0347-364, 0370-382,*

*0282-38, 0402-495, 0497-501, 0502-526, 0530-532, 0533-562, 0563-574, 0575-595, 0679-700,*

*0701-718; see also Joint Pretrial Memo:  (1) Harold Barbot, M.D., (2) Gilbert Kliman, M.D., (3)*

*Harold Skopek, M.D., (4) Elizabeth Teegarden, Ph.D., (5) Ulrich Prinz, M.D., (6) Rev. Dr. Peter*

*James (Presbyterian Church (USA) "PCUSA"); (7) Rev. Ruth Rheinhold (PCUSA), (8) Rev. Dr.*

*Ruth Herr (PCUSA), (9) Rev. Carter Hiestand (PCUSA), (4) David Harold, Manager, Overseas*

*World Mission Prog., (NCCCUSA); (10) Rev. Steven Earl, Director, PCUSA Volunteer in Mission*

*Program; (11) Charles McMillan, CAPT, U.S. Navy Chaplain Corps, PCUSA Council for*

*Chaplains and Military Personnel; (11) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate*

*General, Washington Navy Yard; (12) Dennis Oppman, Deputy Asst., Judge Advocate General,*

*U.S. Navy Fiscal and Administrative Support; (13) Dr. Richard B. Edelman, Ph.D, economist and*

*damages expert; (14) Chief James Perroti, Yale Police Department; (12) Clarence Bohn, J.D.*

*(Retired FBI Document Examiner); (13) Edwin Alford, MFS, (Retired U.S. Secret Service*

*Document Examiner); (15) Russell J. Raymond, (16) Julia M. Raymond, (17) David Speilberg,*

*Ph.D. Notary Public (Connecticut); (18) Norman S. Kiger, General Counsel, U.S. Naval*

*Investigative Service Command, (19) John P. Osborne (FBI Special Agent Retired); (20) Elaine*

*Pagliaro, Director, Connecticut State Police Forensic Laboratory; (21) Lawrence Maxwell, Fraud*

*and Prohibited Mailing Branch, Office of Criminal Investigations, U.S. Postal Service; (22)*

*Dwayne Huebner, (23) James Dittes, (24) Harry Adams, (25) Dottie Robinson, (26) William*

*Stempel, (27) Detra MacDougal, (28) Chris Bucher, (29) Lee McGee, (30) Laura Lyon, (31)*

*George Lindbeck, and (32) Penelope Laurens.*

**(57).  2 Tr. 112-15-21:    Doyle misinformed the jury that "the Judge will explain to you how [under] limited circumstances, when there's bad faith, when it's intentional bad faith, just going out to really hurt somebody for the sake of hurting them, as opposed to legitimate questioning of suspicious circumstances, that is not defamation.  It is not intentional infliction of emotional distress.   Its responsible people doing their job."**

*If the university had a "legitimate questioning" of suspicious circumstances, there would have been an official investigation.  There was none.  Therefore,  contrary to Doyle's representations, the foregoing was not "responsible people doing their job."   Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0049-55, 0072-80, 0157, 0158, 0159-162, 0164-166, 0167-169, 0170, 0171-210, 0213-234, 0235-237, 0238-242, 0243, 0244-45, 0246-252, 0253-54, 0255, 0256-261, 0262-268, 0269-284, 0285-286, 0294-326, 0345, 0347-364, 0370-382, 0282-38, 0402-495, 0497-501, 0502-526, 0530-532, 0533-562, 0563-574, 0575-595, 0679-700, 0701-718; see also Joint Pretrial Memo:  (1) Harold Barbot, M.D., (2) Gilbert Kliman, M.D., (3) Harold Skopek, M.D., (4) Elizabeth Teegarden, Ph.D., (5) Ulrich Prinz, M.D., (6)  Chief James Perroti, Yale Police Department; (7) Clarence Bohn, J.D. (Retired FBI Document Examiner); (8) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); and Defendants (9) Dwayne Huebner, (10)*

*James Dittes, (11) Harry Adams, (12) Dottie Robinson, (13) William Stempel, (14) Detra*

*MacDougal, (15) Chris Bucher, (16) Lee McGee, (17) Laura Lyon, and (18) George Lindbeck.*

**(58.)   2 Tr. 113:5-18:   Doyle misinformed the jury that "it would be wrong on this**

**record for this jury to hold Yale or any of its faculty or administrators who are named as**

**Defendants in this case liable for anything.  They did their job.  They acted responsibly.  And**

**if there were any problems, Mr. Tibbetts created them for himself.  And I'll ask you, after the**

**Judge instructs you, to deliberate and return a verdict in favor of the Defendants."**

*In fact, the jury had only been presented with 10% of the  university's record, the remaining*

*90% of the record showed that Yale and its administrators were responsible for substantial delays*

*and administrative inconsistencies in this case.   The record shows that university officials dragged*

*their feet for almost three years, refused to investigate their own charges, failed to refer the charges*

*to proper law enforcement authorities, refused to allow the plaintiff an attorney for representation*

*to answer criminal charges, and published these charges to the Presbyterian Church, which*

*ultimately caused the plaintiff's loss of professional employment opportunities.   Then one year*

*after these charges, the university expunged all of these defamatory documents from the plaintiff's*

*student record, but the defendants failed to tell a federal  jury that these records had been expunged*

*under FERPA.   Thus, the remaining 90% of the university's record shows that certain faculty and*

*administrators did not act "responsibly" in this case.   Plaintiff was prevented from proving the*

*truth of these statements because the Court suppressed 90% of the university's records and*

*precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed*

*Evidence 0049-55, 0072-80, 0157, 0158, 0159-162, 0164-166, 0167-169, 0170, 0171-210, 0213-*

*234, 0235-237, 0238-242, 0243, 0244-45, 0246-252, 0253-54, 0255, 0256-261, 0262-268, 0269-*

*284, 0285-286, 0294-326, 0345, 0347-364, 0370-382, 0282-38, 0402-495, 0497-501, 0502-526,*

*0530-532, 0533-562, 0563-574, 0575-595, 0679-700, 0701-718; see also Joint Pretrial Memo: (1)*

*Rev. Dr. Peter James (Presbyterian Church (USA) "PCUSA"); (2) Rev. Ruth Rheinhold (PCUSA),*

*(3) Rev. Dr. Ruth Herr (PCUSA), (3) Rev. Carter Hiestand (PCUSA), (4) David Harold, Manager,*

*Overseas World Mission Prog., (NCCCUSA); (5) Rev. Steven Earl, Director, PCUSA Volunteer in*

*Mission Program; (6) Charles McMillan, CAPT, U.S. Navy Chaplain Corps, PCUSA Council for*

*Chaplains and Military Personnel; (7) Jonathon Iseallo, CAPT, USN, Office of Judge Advocate*

*General, Washington Navy Yard; (8) Dennis Oppman, Deputy Asst., Judge Advocate General, U.S.*

*Navy Fiscal and Administrative Support; (9) Dr. Richard B. Edelman, Ph.D, economist and*

*damages expert; (10) Chief James Perroti, Yale Police Department; (12) Clarence Bohn, J.D.*

*(Retired FBI Document Examiner); (13) Edwin Alford, MFS, (Retired U.S. Secret Service*

*Document Examiner); (14) Russell J. Raymond, (15) Julia M. Raymond, (16) David Speilberg,*

*Ph.D. Notary Public (Connecticut); (17) Norman S. Kiger, General Counsel, U.S. Naval*

*Investigative Service Command, (18) John P. Osborne (FBI Special Agent Retired); (19) Elaine*

*Pagliaro, Director, Connecticut State Police Forensic Laboratory; (20) Lawrence Maxwell, Fraud*

*and Prohibited Mailing Branch, Office of Criminal Investigations, U.S. Postal Service; (21)*

*Dwayne Huebner, (22) James Dittes, (23) Harry Adams, (24) Dottie Robinson, (25) William*

*Stempel, (26) Detra MacDougal, (27) Chris Bucher, (28) Lee McGee, (29) Laura Lyon, (30)*

*George Lindbeck, and (31) Penelope Laurens.*

## M (4)  SIDEBAR ON DEFENDANTS' FRAUD TO THE JURY  (2 Tr. 113-115)

THE COURT:    Mr. Tibbetts, do you have anything by way of brief rebuttal, sir?

MR. TIBBETTS:  Yes, Your Honor. I'd like to speak with you on the sidebar.

THE COURT:  Sure.  (Conference held at the bench).

MR. TIBBETTS:   Your Honor, what Mr Doyle has said is in the record . . . [t]he context is not correct, and he knows that. The evidence was never submitted to the committee [Professional Studies Committee].   They never saw any of the documents that were exculpatory, and therefore everything that he is presenting as far as

MR. DOYLE:   I'm sorry, I think the jury can hear.

MR. TIBBETTS:  As far the committee making that decision really is completely skewed. Pending before Judge [Thompson] right now is the issue of fraud.   In the committee's own rule it says that all documents—

MR. DOYLE:  My associate tells me he can hear what he's saying.

THE COURT:  So what's your point, sir?

MR. TIBBETTS:  *I wanted to show there was fraud committed and none of my exculpatory evidence was ever submitted* [to the Professional Studies Committee].   Yes they did exonerate me, but it was only based upon my statement and what Mr. Dittes was saying.   All of the documents and all of the affidavits are –

THE COURT:    You testified to this, and I think there's another document in the record that says here, I'm sending you the whole file, so we got conflicting evidence as to whether this is the case.  I heard you testify to that.  I know, also, I believe there's an exhibit in there that says I'm sending you the whole file on this matter.  But what's your point?

MR. TIBBETTS:  That was the University.  That was the point.  What . . ..Mr. Doyle has presented to the … the jury is not correct, and that's why I want to be able to give additional testimony on that, because there was fraud committed here, and that's what's before Judge Thompson right now. That's why I was asking to have this [complaint] amended.

THE COURT:   *You can't have additional testimony. . . .*

(End of conference at the bench)

## M (5)  PLAINTIFF'S REBUTTAL  (2 Tr. 116-129)

**(59).   2 Tr. 116: 1-9:   Doyle objected to, and moved to strike, plaintiff's testimony that when his evidence "was finally submitted to the Professional Studies Committee," that "one hundred pages" were withheld by university officials.**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237, 0402-495, 0497-501, 0530-562, 0563-574; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); and Defendants (4) Dwayne Huebner, (5) James Dittes, (6) Harry Adams, (7) Dottie Robinson, (8) William Stempel, (9) Detra MacDougal, (10) Chris Bucher, (11) Lee McGee, (12) Laura Lyon, and (13) George Lindbeck.*

**(60).     2 Tr. 116:10-24:   Doyle objected to, and moved to strike, plaintiff's  testimony that "none of [his] exculpatory evidence was ever submitted to the Professional Studies Committee."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.   See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237, 0402-495, 0497-501, 0530-562, 0563-574; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); and Defendants (4) Dwayne Huebner, (5) James Dittes, (6) Harry Adams, (7) Dottie Robinson, (8) William Stempel, (9) Detra MacDougal, (10) Chris Bucher, (11) Lee McGee, (12) Laura Lyon, and (13) George Lindbeck.*

**(61).    2 Tr. 117:3-24:    Doyle objected to, and moved to strike, plaintiff's testimony that "when [he] finally found out what all of the charges were, [he] went to the FBI."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See* Suppressed Evidence 0171-210, 0213-234, 0246-252, 0256-26, 0269-284, 0287-291, 0294-326, 0402-495; see also Joint Pretrial Memo:  Defendants (1) Dwayne Huebner, (2) James Dittes, (3) Harry Adams, (4) Dottie Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher, (8) Lee McGee, (9) Laura Lyon, and (10) George Lindbeck.

**(62).    2 Tr. 119:2-12:    Doyle objected to, and moved to strike, plaintiff's  testimony that "It doesn't make any sense to what Mr. Doyle is saying for [him] to be dragging this thing out. . . . The University never gave [him] any advance notice on [the hearing]."**

Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0213, 0234, -253-54, 0262-268, 0370-382, 0402-495, 0497-501, 0502-526; see also Joint Pretrial Memo:  Defendants (1) Dwayne Huebner, (2) James Dittes, (3)  Harry Adams, (4) Dottie Robinson, (5) William Stempel, (6) Detra MacDougal, (7) Chris Bucher, (8) Lee McGee, (9) Laura Lyon, and (10) George Lindbeck.

**(63).    2 Tr. 120-121:1-61:  Doyle objected to, and moved to strike, plaintiff's testimony that "Mr. Doyle just now stood up, spun it all of context and didn't tell you that the Professional Studies Committee was never given any evidence.   [He has] a stack that thick of documents that should have been submitted."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence 0045-46, 0064-71, 0072-80, 0157, 0164-166, 0167-169, 0171-210, 0216-234, 235-242, 0243, 0235-237, 0402-495, 0497-501, 0530-562, 0563-574; see also Joint Pretrial Memo: (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); and Defendants (4) Dwayne Huebner, (5) James Dittes, (6) Harry Adams, (7) Dottie Robinson, (8) William Stempel, (9) Detra MacDougal, (10) Chris Bucher, (11) Lee McGee, (12) Laura Lyon, and (13) George Lindbeck.*

**(64).    2 Tr. 121:7-14:    Doyle objected to, and moved to strike, plaintiff's testimony that he "asked to have that evidence put in so that [he] can talk about . . . . the signature discrepancy."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants. See Suppressed Evidence  0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; ;  see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David Speilberg, Ph.D. Notary Public (Connecticut); and Defendants (7) Dwayne Huebner, (7) James Dittes, (8) Lansing Hicks, (9) Dottie Robinson and (10) William Stempel.*

**(65).    2 Tr. 122:6-10:   Doyle objected to, and moved to strike, plaintiff's testimony that "it is simply not fair for [him] not to be able to explain the signature discrepancy . . . . Mr. Doyle brought it up.  [He] should be able to explain what the signature discrepancy was."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; ; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David Speilberg, Ph.D. Notary Public (Connecticut); and Defendants (7) Dwayne Huebner, (8) James Dittes, (9) Lansing Hicks, (10) Dottie Robinson and (11) William Stempel.*

**(66).    2 Tr. 122-123:1-3:   Doyle objected to, and moved to strike, plaintiff's testimony that "Yale knows that there was a legitimate reason for the signature discrepancy, of which [the plaintiff] had nothing to do with."**

*Plaintiff was prevented from proving the truth of this statement because the Court suppressed 90% of the university's records and precluded testimony from both the plaintiff's witnesses and the defendants.  See Suppressed Evidence 0036, 0041, 0043, 0044, 0046, 0159-162, 0164-166, 0171-210, 213-234, 0246-252, 256-261, 0383-387, 0402-495, 0533-562, 0598-678, 0679-700; ; see also Joint Pretrial Memo:  (1) Chief James Perroti, Yale Police Department; (2) Clarence Bohn, J.D. (Retired FBI Document Examiner); (3) Edwin Alford, MFS, (Retired U.S. Secret Service Document Examiner); (4) Russell J. Raymond, (5) Julia M. Raymond, (6) David*

*Speilberg, Ph.D. Notary Public (Connecticut); and Defendants (7) Dwayne Huebner, (8) James*

*Dittes, (9) Lansing Hicks, (10) Dottie Robinson and (11) William Stempel.*

## M (6)   CONCLUSION OF DEFENDANTS' FRAUD AT TRIAL

141.    The court may relieve a party from a final judgment, order or proceeding for "fraud

(whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of

an adverse party."  F.R.Civ.P. 60(b)(3).   A Rule 60(b) motion reaches all fraud and "rejects the

confusing distinction between extrinsic and intrinsic fraud."  Wright, Miller & Kane, <u>Federal

Practice and Procedure: Civil 2d</u> §  2860 (2d ed. 1995).   Under the rule, a party may be relieved

from a judgment on the basis of fraud either "intrinsic" fraud, such as those matters that were

actually presented and considered in trial or "extrinsic" fraud, such as a matter that was not actually

tried but which "prevented" a party from obtaining a fair trial.  *See* Matthew Bender, 11 Federal

Practice, Rule 60-20 (2d ed. 2002) (judgments may be set aside for a wide variety of alleged

"frauds," including, allegations of  false testimony and that "false documents were presented" citing

*Londorf v. Seefeldt*, 47 F.3d 893, 897-898 (7th Cir. 1995).

142.    The controlling test is "whether the alleged fraud prevented the moving party from

fully and fairly presenting his or her case at trial."  *Id.; Lawrence v. Wink (In re Lawrence)*, 293

F.3d 615, 626 (2d Cir. 2002) ("alleged fraud of the defendants prevented the issue of fairness from

being fully explored.").   Thus, "relief from a judgment or order may be permitted where (1) the

moving party possessed a meritorious claim at trial, (2) the adverse party engaged in fraud,

misrepresentation, or other misconduct, and (3) the adverse party's conduct prevented the moving

party from fully and fairly presenting its case during trial."  <u>Federal Rules Civil Handbook</u>, (12th ed.

2005) at 948; Wright & Miller, <u>Federal Practice and Procedure: Civil 2d</u> §  2860; 3 Moore's Federal

Practice, *Lawrence*, 293 F.3d at 626; *see also Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir. 1989).

143.    In this case, plaintiff was clearly "prevented" from being "*heard 'at a meaningful time and in a meaningful manner,'*" *Mathews,* 424 U.S. at 333; *Armstrong*, 380 U.S. at 552; *Grannis*, 234 U.S. at 394, because the court:   (1) declined to hear any testimony from the plaintiff's witnesses or the defendants, (2) suppressed 90% of the defendant university's record at the last minute, and (3) allowed defendants' counsel to make 66 material misrepresentations about the contents of the university's records--when the court was clearly on notice that a fraud was being committed upon the court.   *See* Transcript at Sidebar (2 Tr. 113-115) (Plaintiff:  "*I wanted to show there was fraud committed . . . .*   What . . . Mr. Doyle has presented to the … the jury is not correct, and that's why I want to be able to give additional testimony on that, because there was fraud committed here.")

144.    These 66 specific instances of fraud and misrepresentation clearly tainted the evidence before the jury.   Accordingly, Mr. Doyle, as defendants' counsel for the past five years on this case, knew, or should have known, that he was inaccurately representing the university's record to the jury.

145.    Where a Rule 60(b) motion contains allegations that an attorney was involved in the presentation of knowingly perjured or false testimony, this will ordinarily  support vacatur of judgment, especially where the tainted evidence goes to the integrity of the original judgment. *Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078-80 (2 Cir. 1972 ) (non-disclosure of materially relevant documents certainly "afford[s] ground for collateral attack."); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir., 1972) (same); *Mastini v. American Tel. & Telegraph Co.*, 369 F.2d 378, 379 (2d Cir. 1966), *cert. denied*, 387 U.S. 933, 87 S. Ct. 2055,

18 L. Ed. 2d 994 (1967) (same); *Nederlandsche Handkel-Maatschappij v. Jay Emm, Inc.*, 301 F.2d

115, 115 (2d Cir. 1962) (same).

146.    In order to plead fraud with particularity, the moving party must show facts that give

rise to "a strong inference of fraudulent intent" and show that defendants had a "motive" and an

"opportunity" to commit fraud. *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir.

1994) *cert denied*, 1994 LEXIS 6978.    In this case, defendants had a "motive" to clear themselves

from liability.    With such a "motive" squarely in place, the requisite "opportunity" was

demonstrated when the defendants made 66 material misrepresentations about the content of the

university's record.    If these 66 representations were correct, then defendants are entitled to their

judgment.    But if these 66 representations were knowingly and deliberately incorrect, then plaintiff

is entitled to vacatur of the judgment under F.R.Civ.P. 60(b)(3).

147.    Defendants knew that they could make 66 material misrepresentations about the

university's record *because the court suppressed 90% of their record and declined to hear any*

*testimony from either the plaintiff's witnesses or the defendants.*    A review of the Plaintiff's

Suppressed Evidence clearly shows that the defendants' 66 material misrepresentations are

*contradicted* by the documents in the university's record; thus, such willful misconduct constitutes

"strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at

1128; *OBrien v. Nat. Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (fraud

allegations may be pleaded by "inference" if supported by a sufficient "factual basis");

*Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1005, 98

L. Ed. 2d 650, 108 S. Ct. 698 (1988) (same).

148.    Thus "where the moving party satisfies the applicable tests" under Rule 60(b), and

the adverse party engaged in fraud, misrepresentation, or other misconduct which clearly prevented

the moving party from receiving due process in being "*heard 'at a meaningful time and in a meaningful manner,'*" then "relief will be granted." Wright & Miller, 2860 at pg. 317 (citing *Klapprott v. United States*, 335 U.S. 601, 615, 69 S.Ct. 384 (1949) ("Petitioner is entitled to a fair trial. He has not had it. . . . Fair hearings are in accord with elemental concepts of justice, and the language of . . . 60 (b) is broad enough to authorize the Court to set aside the . . . judgment and grant petitioner a fair hearing."); *Lawrence v. Wink*, 293 F.3d 615, 624 (2d Cir. 2002) (vacating district court judgment where defendants "engage[ed] in tactics to obfuscate the record."

149.    Moreover, here, the trial court was clearly apprised that the defendants were engaged in fraud and misrepresentation of the university's record, but the court did nothing about it; thus, the resulting judgment is void because a court that condones fraud "act[s] in a manner inconsistent with due process of law." 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2862; *Otte,* 596 F.2d at 1099; *Fustok,* 873 F.2d at 39; *Parker,* 197 FRD at 215-216 (D.C. Conn. 2000) ("judgment is void under Rule 60(b) . . . if the court . . . acted in a manner inconsistent with due process of law").

**N.    COURT PREVENTED PLAINTIFF FROM FULLY AND FAIRLY PRESENTING CLAIMS AT TRIAL**

150.    The court "prevented" the plaintiff from "fully and fairly" presenting both competent evidence and testimony at trial. Federal Rules Civil Handbook, at 948; Wright & Miller, Federal Practice and Procedure: Civil 2d § 2860; *Lawrence*, 293 F.3d at 624. Plaintiff had four claims in this case: (1) defamation, (2) breach of contract, (3) tortious interference with prospective business advantage, and (4) intentional infliction of emotional distress.

151.    As already noted above, in a surprise move the court suppressed 90% of the university's record at the last minute. At a minimum, this judicial action should have come about through a pretrial conference so that the both parties could prepare and argue the court's decision.

The court then declined to hear testimony from plaintiff's 39 witnesses and 9 experts.   And the court further declined to subpoena the presence of the defendants for examination at trial.   In all, the court excluded testimony from 56 parties and/or individuals who had a direct bearing on the claims in this case.   Moreover, the court suppressed 90% of the university's record at the last minute.   Such arbitrary and capricious actions go to the heart of the plaintiff's case that the court denied fundamental due process and a full and fair hearing on the merits of the claims.   In further support of how the court "prevented" the plaintiff from "fully and fairly" presenting his claims, the court's following acts and/or omissions are shown as follows:

A.     The elements required to prove a prima facie claim for defamation include *inter alia* "publication" and "harm to reputation."   *Miles v. Perry*, 529 A.2d 199, 209 (Conn. App. 1987) ; *Moriarty v. Lippe*, 162 Conn. 371 (1972).    Here, however, the court "prevented" the plaintiff from showing "publication" or "harm to reputation"  by (1) suppressing all of the documents in the university's records that showed "publication" or "harm to injury," and (2) by declining to hear any testimony from any of the witnesses or defendants on these necessary elements.    Thus, the court legally and physically "prevented" the plaintiff from putting on an otherwise prima facie claim for defamation by suppressing evidence of "publication" and testimony on "harm to reputation."

B.     The elements required to prove a claim for breach of contract between a private college and a student include the failure by a college to follow its own internal rules and regulations.    *Soderbloom v. Yale University*, 1992 Conn. Super. LEXIS 256, 3-4 (Conn. Super. Ct., 1992) ("the basic legal relationship between a student and a private university or college is contractual in nature.   The catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract.  Questions of discipline, academic matters, and tuition and scholarship disputes have been addressed by courts and resolved on contract principles.") (internal citations omitted).    In this case, however, the court "prevented" the plaintiff from proving his breach of contract claim by suppressing evidence that the Yale Professional Studies Committee had failed to follow its own internal rules from 1989 to 1992.   The court "prevented" this element from being shown because the court arbitrarily suppressed all documents that were not on Yale University letterhead.   Because many of the documents in the university's record were not on letterhead, the plaintiff was "prevented" from showing an otherwise prima facie case of the university's failure to follow its own "catalogs, bulletins . . . and regulations." *Soderbloom*, 1992 Conn. Super, LEXIS 256, at 3-4.

C.     The elements required to prove a prima facie claim for interference with prospective advantage include that the plaintiff had one of more business opportunities, that the defendants had knowledge of these opportunities, that the defendants interfered with these

opportunities, and that the plaintiff lost these opportunities. *See Solomon v. Aberman,* 196 Conn. 359, 364 (Conn., 1985) ("The essential elements of such a claim include, of course, the existence of a contractual or beneficial relationship and that the defendant(s), 'knowing of that relationship, intentionally sought to interfere with it; and, as a result, the plaintiff claimed to have suffered actual loss.'). In this case, the court "prevented" the plaintiff from proving this claim by suppressing all evidence from the defendants' records which showed (1) plaintiff's contractual relationships with the U.S. Navy and the Presbyterian Church (USA), and (2) all documents that the defendants "interfere[d]" with these contractual relationships. The court suppressed this evidence because it was not written on university letterhead! The court further prevented any testimony from the plaintiff's witnesses at the U.S. Navy and the Presbyterian Church (USA).

D.     The elements necessary to prove an intentional infliction of emotional distress claim include that (1) the "actor intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his or her conduct," and that the "conduct was extreme and outrageous." *McGrath v. Yale Corp.*, 1993 Conn. Super. LEXIS 1360, 9-10 (Conn. Super. Ct., 1993); *Petyan v. Ellis*, 200 Conn. 243, 253 (1986). In this case, however, plaintiff was prevented from showing internal university memos that showed certain officials knew that forcing criminal charges against the plaintiff without any evidence or investigation would be reckless and in violation of school disciplinary regulations. The court further suppressed documentation in the university's records that the university went ahead with these unsubstantiated charges for three years, without any attempt at an investigation by law enforcement authorities. The university is in the business of offering degrees and preparing individuals for service in society. Clearly, the university knew, or should have known, that maintaining criminal charges against the plaintiff, without an investigation, and forcing the plaintiff to loose his candidacy for ordination in the PCUSA and officer commission in the U.S. Navy Reserve, would "likely" result in emotional distress. *McGrath*, 1993 Conn. Super. LEXIS 1360, at 9-10. However, the court prevented the plaintiff from making this claim because 90% of the university record was arbitrarily suppressed and the court precluded testimony from the plaintiff's 39 witnesses and 5 experts. As a result, the plaintiff was precluded from all evidence which he needed to prove his claim that the university knew or should "have known that emotional distress was a likely result" of forcing a student to face criminal charges, without an attorney, without any investigation, and by withholding all of the student's exculpatory evidence.

152.     In summary, the court suppressed the required legal and evidentiary grounds on all four claims, thus preventing the plaintiff from "fully and fairly" proving his claims. Clearly, then, a review of the court's arbitrary and capricious actions above prevented the plaintiff from being "*heard 'at a meaningful time and in a meaningful manner.*'" *Mathews,* 424 U.S. at 333; *Armstrong*, 380 U.S. at 552; *Grannis*, 234 U.S. at 394. And where this court denied the plaintiff the opportunity to factually and legally present his claims to the jury, the court clearly "acted in a

manner inconsistent with due process of law." *Otte v. Manufacturers Hanover Commercial Corp.*,
596 F.2d 1092, 1099 (2d Cir. 1979) (quoting Wright & Miller); *Fustok,* 873 F.2d at 39; *Parker,*
197 FRD at 215-216 (D.C. Conn. 2000) ("judgment is void under Rule 60(b) . . . if the court . . .
acted in a manner inconsistent with due process of law").

### O.   SUMMARY OF DUE PROCESS VIOLATIONS AT TRIAL

153.   To summarize the evidence and testimony suppressed from the jury,  the chart below
shows the requirements set forth for a full and fair hearing in the Joint Pretrial Memorandum (Ex.
31), and the actual evidence and testimony heard at trial:

| CLAIMS: (1) Defamation and (2) Intentional Infliction of Emotional Distress | | | |
|---|---|---|---|
| **Due Process Considerations** | **Joint Pretrial Memo** | **Trial: Jan 18-19, 2000** | **Percentage** |
| **1.   Witnesses:** | | | |
| PCUSA | 3 | 0 | **0 %** |
| NCCUSA | 2 | 0 | **0 %** |
| US NAVY CHC | 4 | 0 | **0 %** |
| NISCOM | 1 | 0 | **0 %** |
| Postal Inspector | 3 | 0 | **0 %** |
| Ret. FBI | 2 | 0 | **0 %** |
| CT State Police Lab | 2 | 0 | **0 %** |
| YPD | 1 | 0 | **0 %** |
| Witnesses/ Emot. Distress | 3 | 0 | **0 %** |
| **2.   Experts:** | | | |
| QDE Experts (FBI ret) | 2 | 0 | **0 %** |
| Economic Experts | 2 | 0 | **0 %** |
| Doctors/Psychiatrists | 5 | 0 | **0 %** |
| **3.   Defendants' presence**: | | | |
| Yale Corp | 5 | 0 | **0 %** |
| YDS Administration | 8 | 0 | **0 %** |
| PSC | 5 | 0 | **0 %** |
| YDS Faculty | 6 | 0 | **0 %** |
| **4.  Discovery (Rule 34** | 1299 | 135 | **10%** |

| **Documents):** Admitted Evidence =135 Suppressed Evidence = 1164 Total Evidence = 1299 | | | |
|---|---|---|---|
| **5.   Discovery (Admissions)** | 287 | 0 | **0%** |
| **6.   Counsel (plaintiff)** | 1 | 0 | **0%** |
| **7.   Claims** | 32 total claims | 2 | **6%** |
| **8.   Trial duration** | 18 days | 1 (two ½ days) | **5%** |
| **Total Due Process (Nos. 1-8)** | | | **3%** |

154.    The court only heard two claims of the thirty-two (32) claims pending in this litigation, i.e. *Dittes, Stempel, Levin,* and *Robinson*.    The total discovery in *Dittes* was *de minimus* with plaintiff obtaining his full student record and partial or incomplete answers to 21 interrogatories, with an additional 30 interrogatories denied.    The court refused to allow depositions and requests for admission in *Dittes*.    In *Levin, Stempel* and *Robinson*, there has been no discovery whatsoever nor was there ever a trial on the merits of any of the claims in those cases. A total of 32 claims were brought in *Dittes*, and only 6% were heard.    The overall due process accorded in *Dittes* (a percentage compiled from allowable witnesses, experts, discovery,  claims, trial duration, defendants' presence, and representation by counsel) was 3 %.    With three-percent of procedural due process afforded in *Dittes*, it is not unreasonable to assume a 97% error rate in the final judgment in this case.

### P.    MOTIONS FILED FOR POST-JUDGMENT RELIEF (2001)

155.    The court entered final judgment for the defendants on March 29, 2000.   Exhibit 42 hereto.  Within ten days after entry of judgment, plaintiff moved for a new trial under Fed. R. Civ. P. 59(b).  The facts and authorities of law that mandate a new trial were set forth as follows:

●      The Court erred as a matter of law in not allowing a *pro se* plaintiff to amend his complaint over a coarse of five years of litigation so that all claims could be tried upon the merits.

●      The Court erred as a matter of law in not consolidating the plaintiff's similar actions--that is, *Tibbetts v. Levin*, 397CV02561 (AWT); *Tibbetts v. Stempel* 397CV02683 (CFD); and *Tibbetts v. Robinson,* 397CV02682 (GLG)-- all against the same defendants, on the same claims, on the same fact pattern, as those in the instant case.  As the Court unequivocally knows, these actions were the identical amendments which the plaintiff sought to amend in the instant case on numerous occasions pursuant to F.R.Civ.P. 15.

●      The Court erred as a matter of law in refusing to hold a pre-trial conference.  First, both parties stipulated to this pretrial conference.  Second, the pretrial conference was necessary to resolve a number of issues, not the least of which was the need to take depositions from key fact witnesses, resolve unanswered interrogatories and requests for admissions, stipulate to uncontroverted facts, produce expert reports, and amend the pleadings to include supplemental claims under F.R.Civ.P. 15(a)(d).   Accordingly, the Court abused its discretion by inviting the plaintiff, through two pre-trial orders, to submit matters that required adjudication prior to trial, but thereafter refusing to convene a pretrial conference to hear the matters and instead forcing the case to trial, with many issues being resolved only hours before the trial.

●      The Court erred as a matter of law in refusing to grant a reasonable continuance to plaintiff's counsel so that they could prepare this action for trial. This request for a continuance was reasonable under the circum stances, where many issues remained unresolved, and plaintiffs counsel required a reasonable time to prepare this case for trial. [Exhibit 43 hereto].

156.    On May 15, 2000, the court denied plaintiff's motion for a new trial on the erroneous

ground that plaintiff's motion had been filed "38 days after the entry of judgment."   Exhibit 44

hereto.   The court made a fatal error in computing the "38 days after the entry of judgment."   In so

reasoning, the court held in a misplaced argument as follows:

On February 29, 2000, following a jury trial, the court entered judgment for the defendants on all counts of the complaint.  On April 7, 2000, the plaintiff filed the within motion pursuant to Fed.R.Civ.P. 59 arguing that the court should set aside the verdict and judgment.

Fed. R. Civ. P. 59(b) states that "[a]ny motion for a new trial shall be filed no later than 10 days after the entry of judgment."  In the present case, the plaintiff filed his motion for a new trial 38 days after the entry of judgment.  The plaintiff's motion for a new trial (document no. 215) is DENIED.  [Exhibit 44 hereto].

157.    The court incorrectly calculated the date for entry of judgment as "February 29,

2000" rather than *March 29, 2000*.   Plaintiff immediately filed a motion to correct the court's

clerical error:

The court's ruling is in error:   it was based on an inaccurate and nonexistent date of
February 29, 2000 for the entry of judgment.   The judgment was entered on March 29, 2000
(Doc. No. 214).    Plaintiff made proper application for a new trial within eight days after
the entry of judgment.   Plaintiff's Motion For a  New Trial is timely and should be
considered without prejudice this error.   [Exhibit 45 hereto].

158.    Notwithstanding that the court had incorrectly calculated the date of entry, *the court
then proceeded to delay a ruling on plaintiff's motion for an entire year*.   On March 21 2001, one
full year after plaintiff moved for a new trial, the court conceded:   "the plaintiff's argument has
merit in that the motion for a new trial was, in fact, timely filed."  *Id*.   Nevertheless, this court
"denie[d] the relief requested because the plaintiff has failed to present sufficient grounds
authorizing a new trial under Federal Rule of Civil Procedure 59."  *Id*.

159.    During the one-year interim in which the court delayed ruling on the above Rule
59(b) motion, the plaintiff filed three post-trial motions for relief.   These motions are as follows:

(1)    Plaintiff's Supplemental Memorandum of Law in Support of a New Trial;

(2)    Plaintiff's Motion to Recuse Judge Alfred V. Covello for a Violation of 28 U.S.C.
§455(a); and

(3)    Plaintiff's Motion to Vacate Judgment Under F.R.Civ.P. 60(b)(6).

160.    First, plaintiff filed a Supplemental Memorandum of Law in Support of a New Trial
and set forth the facts and law as follows:

Plaintiff has moved the Court for a new trial.   He has also moved the Court for clarification
of an order denying Plaintiff's Motion for Leave to File an Amended Complaint *Nunc Pro
Tunc*. . . .  In support of this motion, plaintiff states and provides as follows:   The total
amount of discovery provided in this case is as follows: (1) defendants' answers to 17
interrogatories and (2) production of plaintiff's complete student record.   This Court refused
to require the defendants to respond to Requests for Admissions, answer outstanding
interrogatories, agree to findings of fact and conclusions of law, allow defendants'
depositions to be taken, or sanction defendants for repeated dilatory discovery tactics and
defaults.

The U.S. Supreme Court defines one of the most basic policies of Rule 15(a) of the Federal
Rules of Civil Procedure:

> "leave to amend shall be freely given when justice so requires"; this mandate is to be heeded.  *See generally*, 3 Moore's, Federal Practice (2d ed. 1948) & 15.08, 15.10. If the underlying facts or circumstances relied upon by plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.

*Foman v. Davis*, 371 U.S. at 182, 83 S.Ct. at 230, 9 L.Ed.2d 222 (1962).

In the instant case, [this court consistently denied a pro se plaintiffs attempt to amend his complaint during the course of five years of litigation.  The court refused to hold a pretrial conference and forced the plaintiff to trial without amendments to his pleadings, without the assistance of counsel, and with minimal discovery.  The court further denied plaintiffs latest motion to amend his pleadings by expanding the grounds of a previous order, without providing notice of same to the plaintiff.   Under these circumstances, . . .  the Supreme Court [would] conclude:

> It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities. The Federal Rules reject the approach that pleading is a game of skill. . .  and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.  Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman supra*, 371 U.S. at 182, 83 S.Ct. at 230 (citing  *Conley v. Gibson*, 355 U.S. 41,48, 2 L.Ed.2d 80, 86, 78 S.Ct. 99); *International Controls Corp. v. Vesco* 556 F.2d 665, 669 (2d Cir. 1977) *cert denied* 98 S.Ct. 730, 434 U.S. 1014.

The Supreme Court has further instructed district courts that the liberal amendment policy of Rule 15(a) should be more applicable to *pro se* plaintiffs, where there are "colorable grounds for relief."  *Hughes v. Rowe*, 449 U.S. 5, 9-10, 101 S.Ct. 173, 175-76 (1980)( *per curiam*); *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972); *Davis v. Bryan*, 810 F.2d 42, 45 (2d Cir. 1987)(Cabranes D.Conn) (court should grant leave to amend where *pro se* plaintiff recounts sufficient facts to allege a cause of action).

Finally, in *Richardson Greenshields Securities, Inc. v. Lau,. . .* the Second Circuit concluded that a district court had effectively prevented a party from filing a motion for leave to amend by (a) refusing to permit a motion to amend without prior conference, (b) failing to hold a conference on the matter until nearly five months after it was requested, and (c) then denying the same amendment for being filed too late.   825 F.2d 647, 652 (2d Cir. 1987). . . . In concluding *Richardson* the Second Circuit held that absent:

[e]xtraordinary circumstances, such as a demonstrated history of frivolous and vexatious litigation, *see In re Martin-Trigona*, 737 F.2d 1254, 1261-62 (2d Cir. 1984), or a failure to comply with sanctions imposed for such conduct, *Johl v. Johl,* 788 F.2d 75 (2d Cir. 1986)(per curiam), a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure.

*Richardson*, 825 F.2d at 652 (emphasis supplied); *State Teachers Retirement Ed. v. Fluor Corp,* 654 F.2d 843, 856 (2d Cir. 198 1)(same). . . .  Thus, this Court should have allowed a *pro se* plaintiff to amend his complaint, where he twice requested "the necessity" to amend his pleadings in pretrial memoranda, and the court denied the pretrial conference and prematurely forced the case to trial.  [Exhibit 46 hereto].

### Q.    MOTION TO RECUSE JUDGE  UNDER 28 USC § 455(a)

161.    On January 12, 2001, in order of filing, plaintiff moved to recuse the Honorable

Alfred V. Covello for violations of 28 U.S.C. § 455(a), which requires that a judge must disqualify

himself if "his impartiality might be reasonably questioned."    Plaintiff set forth the facts and law

to support this recusal of Judge Covello:

Title 28 U.S.C. § 45 5(a) provides that: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned." Notably, under § 455(a), recusal is not limited to cases of actual bias; rather, the statute requires that a judge recuse himself whenever an objective, informed observer could reasonably question the judge's impartiality, regardless of whether he is actually partial or biased.  *See, Liljeberg v. Health Sen's. Acquisition Corp.* 486 U.S. 847, 860, 108 S.Ct. 2194 (1988); *U.S. v. Bayless,* 201 F.3d 116 (2d Cir. 2000)(same).

In 1974, Congress amended 28 U.S.C. § 455 to "broaden and clarify the grounds for judicial disqualification." H.R. Rep. No. 93-1453 (1974). This amendment substantially revised the previous standard for recusal of federal judges.  *See, Liteky v. United States*, 510 U.S. 540, 566, 114 S.Ct. 1147 (1994). While the previous law required a judge to recuse himself only when it was "improper, in his opinion, for him to sit," 28 U.S.C. § 455 (1970), thus "establishing a subjective standard," the revised § 45 5(a) adopts the standard of a "reasonable observer."  *See Liteky* 510 U.S. at 548. As a result, the judge's own subjective standard of perception for impropriety is not necessary to invoke the statute. Rather, the Second Circuit elaborates this new standard under § 455(a):

[A] court of appeals must ask the following question: Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned? Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt justice would be done absent recusal?

*Diamondstone v. Macaluso*, 148 F.3d 113, 120-21 (2d Cir. 1998) quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir. 1992). The foregoing standard is "designed to promote public confidence in the impartiality of the judicial process." *SEC v. Burnham Lambert Inc.,* 861 F.2d 1307, 1313 (2d Cir. 1988) *cert. denied*, 490 U.S. 1102 (1989). To achieve this objective, the Second Circuit makes it clear that:

> like all legal issues, judges determine the appearance of impropriety -- not by considering what a straw poll of the only partly informed man-in-the-street would show -- but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge.

*Diamondstone*, 148 F.3d at 127, citing, *In re Drexel Burnham Lambert* 861 F.2d at 1311.

. . . . To summarize, then, the facts and record in this case amply demonstrate that over the past five years, the Covello Court has demonstrated an appearance of impropriety, if not deep-seated bias, by (1) failing to enforce a pro se plaintiffs right to obtain discovery, (2) failing to allow an amendment and/or consolidation of pleadings, (3) failing to sanction defendants for bad faith discovery tactics, (4) failing to investigate defendants' fraud on the court, and (5) failing to allow plaintiff the fundamental fairness of representation by counsel at trial. In addition, the spectre of "extrajudicial bias" is raised wherein this Court was on notice of the partial destruction of records from the Court's docket, favoring the defendants, but the Court refused or declined to investigate this matter, thus, creating the appearance of a preferential bias for the defendants. When the totality of these circumstances are reviewed, an objective and disinterested observer, fully informed of the facts and evidence in this case, "might reasonably question the impartiality" of this Court and entertain significant doubt as to whether justice might be done absent recusal. *Liljeberg*, 486 U.S. at 865, 108 S.Ct. at 2205 (court affirmed recusal of judge because of the appearance of impropriety that permeated the entire proceeding.).

In the final analysis, then, it is quite immaterial whether this Court was biased against a pro se plaintiff, or simply too timid to apply the law to defendant Yale University. In either case, as Mr. Justice Frankfurter noted in Wilkerson v. McCarthy there, as here, "A timid judge, like a biased judge, is intrinsically a lawless judge." 336 U.S. 53, 65, 69 S.Ct. 413, 419 (1949). [Exhibit 49 hereto].

162.    Notwithstanding the above motion to recuse, on February 20, 2001, plaintiff filed a

motion to vacate the judgment pursuant to F.R.Civ.P. 60(b)(6). The motion to vacate was based

upon the pending motion to recuse the district court judge in this case:

> A violation of 28 U.S.C. § 455(a) (hereinafter " 455(a)")--which requires a judge to disqualify himself in any proceeding in which his impartiality might be questioned—is established where a reasonable person, knowing all relevant facts, "might reasonably

question the impartiality" of that presiding judge.  In the instant case, a reasonable person, knowing all relevant facts, would question the impartiality of Judge Covello.  In *Liljeberg v. Health Services Acquisition Corp.*, the Supreme Court ruled that vacatur under Rule 60(b)(6) is an appropriate remedy for a judicial violation of § 455(a):

> In determining whether a § 455(a) violation requires vacatur under Rule 60(b)(6)—which gives federal courts broad authority to grant relief from a final judgment "upon such terms as are just," provided that the motion is made within a reasonable time—it is appropriate to consider the risk of injustice to the particular parties, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

486 U.S. 847, 848, 108 S.Ct. 2194, 2196-97 (1988).

In *Liljeberg* judgment was vacated under Rule 60(b)(6) as the "proper remedy for a 455(a) violation in the circumstances of this case." *Id* at 848. The gravity of this judicial conduct is the equivalent here--which is fully set forth in Plaintiffs Memorandum of Law in Support of a Motion to Recuse to Judge Alfred V. Covello.  These facts "create precisely the kind of appearance of impropriety that 455(a) was intended to prevent." *id* at 867.

The standard to vacate a judgment under Rule 60(b)(6) is satisfied in this case.  *Id.* at 847. The three elements, as set forth in *Liljeberg* are as follows:

1).     The "risk of injustice" to the plaintiff is enormous where he has invested over ten years of his life--five years in the instant litigation--to resolve the claims in this action. *Id* at 847.  However, as outlined in Plaintiff's Motion to Recuse Judge Covello, this Court b demonstrated partiality by endorsing defendants' bad-faith litigation, defaults, and abusive discovery tactics and permitting a fundamentally unfair trial, in which plaintiff was denied representation and precluded from testing all of his claims on their merits.  In contrast, the "risk of injustice" to the Defendant Yale University is negligible where meaningful discovery was never produced, and defendants were responsible for the five years of protracted litigation.

2).     Vacatur in this case will not "produce injustice in other cases." *Id* at 847.  In fact, it may prompt other judges in other districts to more fully enforce the basic tenet of the Federal Rules of Civil Procedure--that is, to provide liberal discovery and pleadings in the interest of promoting substantial justice.  In addition, a careful study of the record in this case suggests there is a greater risk of unfairness in upholding a judgment for the defendants, who would benefit from bad-faith litigation and dilatory, abusive discovery tactics.  Upholding this judgment would send the wrong message to other defendants who may think a willful disregard of discovery obligations are condoned under the Federal Rules.

3).     Moreover, where "circumstances" create "an appearance of partiality," failure to vacate a judgment would "risk undermining the public's confidence in the "judicial process." 487 U.S. at 848.  In *Liljeberg*, as here, the Supreme Court concluded

"that in determining whether a judgment should be vacated for a violation of § 455(a) . . . We must continuously bear in mind that 'to perform its high function in the best way 'justice must satisfy the appearance of justice.'" 486 U.S at 863, citing *In re Murchison*, 349 U.S. 133, 136,75 S.Ct 23, 25 (1955).   [Exhibit 50 hereto].

163.    On March 22, 2001, the court *denied* the motion to recuse as well as the motion to vacate judgment, *without any explanation or comment*.  *See* Exhibit 51 hereto.   Neither the court nor the defendants challenged any of the facts in these motions for relief from judgment.


### R.    INDEPENDENT ACTION FILED TO ATTACK VOID JUDGMENT

164.    Although plaintiff timely appealed to the U.S. Court of Appeals for the Second Circuit, he also filed a Rule 60(b) Independent Action to collaterally attack the court's judgment for voidness, where the court had blockaded all procedural due process in *Dittes* by denying meaningful discovery, amendments, representation by counsel and a full and fair trial.    The new action was styled as *Tibbetts v. President and Fellows,* 01-CV-1763, and it was filed on September 18, 2001.  Exhibit 52 hereto.

165.    *Tibbetts v. President and Fellows* was timely filed within six months of the court's final order in *Dittes* on March 21, 2001.   Defendants, strangely enough, now argue that this action is "untimely" and that it should be dismissed.   But their arguments are disingenuous and misplaced.

166.    Defendants claim that *Tibbetts v. President and Fellows* should have been filed within one year of the trial date, January 18-19, 2000.   However, as already noted above, this court had not even entered a final dispositive ruling on plaintiff's motion for a new trial one year at that date.   Indeed, January 18-19, 2001, came and went without any final ruling whatsoever from this court regarding the timely filed post-trial motions.   It was not until March 21, 2001--a year and two months after the trial date—that this court finally ruled on plaintiff's motion for a new trial date. Accordingly, March 21, 2001, constitutes the correct trigger date to file a Rule 60(b) motion for

relief from the court's "final judgment, order, or proceeding."   And all of the within claims have

been timely filed in *President and Fellows* within six months after this court's "final judgment" on

March 21, 2001.   Further, the claims in *President and Fellows* are still pending before this Court,

therefore, there can be no argument that plaintiff has not timely filed the necessary motions to

obtain relief in vacating the above void judgment under Rule 60(b)(4).

### S.     SUMMARY OF THE COURT'S DUE PROCESS VIOLATIONS THAT RENDERS THE JUDGMENT "VOID" UNDER RULE 60(B)(4)

167.     A summary of the court's actions, as more fully set forth above, that prevented the

plaintiff from fully and fairly proving his claims and being "heard 'at a meaningful time and in a

meaningful manner'" are as follows:

(1)     The Dittes Court declined or refused to enforce the plaintiff's right to obtain meaningful discovery from the hands of the defendants over the course of five years. Indeed, the only discovery that the plaintiff was able to obtain in this litigation was the partial answer to 21 interrogatories and a copy of his full student record (which he already had).  The court refused to enforce the plaintiff's right to answers to interrogatories which the defendants never answered.  The court granted the plaintiff permission to propound additional interrogatories, and then arbitrarily and capriciously withdrew this permission when the plaintiff filed a Writ of Mandamus with the Second Circuit.   Finally, the court refused to allow the plaintiff to take any depositions of any of the defendants over a period of five years, and refused to appoint a magistrate to oversee the contention between the parties over discovery matters.   In total, the plaintiff requested the completion of discovery no less than nine times, but the court refused to grant this completion of discovery and instead simply forced this case to trial with only a *de minimus* amount of discovery completed.  *See supra* pp 16-21

(2)     The court failed or refused to grant the plaintiff the right to amend his complaint eleven times over the course of five years.   When the court refused to accept the amended complaint, the plaintiff was forced to file three new supplemental causes of action to stop the statute of limitations from expiring.   These claims were *identical* to the claims originally brought in *Dittes*.   When the plaintiff attempted to consolidate these claims with the *Dittes* and obtain discovery on them, the court denied this consolidation.  Even the defendants moved to consolidate these three supplemental actions with the instant action, but were denied.   In short, the court did nothing to consolidate or allow amendments in *Dittes* and instead allowed

the amendments in this action to multiply into four cases, before four separate judges.   Moreover, the amendments in this case never had any discovery, and after these amendments were filed, the defendants moved to stay all discovery, pending an outcome in *Dittes*.  *See supra* pp 20-22.

(3)     After the plaintiff's bankruptcy concluded, the plaintiff filed three requests to amend or consolidate all of the claims.   *See supra* pp 22-23.   Plaintiff also requested that the court rule on outstanding requests to complete discovery, such as allowing depositions of the defendants, enforcing plaintiff's right to obtain answers to other outstanding interrogatories, and rule on 287 requests for admissions.  All of these discovery requests and need for amendment or consolidation had been put in the Joint Pretrial Memorandum.   The court allowed four months to elapse without setting any pretrial conference on these matters.   The plaintiff then moved for an expedited pretrial conference, but the court denied this motion and simply put everything down for trial and "the next available jury selection."  *See* Ex. 32.

(4)     Plaintiff filed additional motions to complete discovery and amend his complaint.   It is an outrage that the trial judge then modified one of the orders *ex post facto* to deny the plaintiff the right to amend his complaint.  *See supra* pp. 28-30.

(5)     The court pushed for a trial without resolving any of the outstanding discovery issues or taking care of the need for amendment and consolidation. Plaintiff hired counsel at the last minute for this trial and asked for a reasonable extension of time so that his newly retained counsel could complete discovery and try this case in a proper fashion.   The judge refused.   Further requests to amend or consolidate the complaint were denied and the judge even modified orders *ex post facto* to fully prevent the plaintiff from amending his complaint.  *See supra* pp. 28-30.

(6)     Plaintiff filed a Writ of Mandamus with the Second Circuit to stop the judge from prematurely forcing a trial without any meaningful discovery, amendments or consolidation of related actions.   In response, the judge retaliated and compelled jury selection and refused to consider plaintiff's request that his counsel try the case. *See supra* pp. 28-37.

(7)     On January 18, 2000, the court convened the jury to hear the *Dittes* case. The court had taken no efforts to make sure this case was prepared to go the jury. The court had not looked at any of the evidence and had denied the parties' request for pretrial conference.   The court then compelled the plaintiff to try his case, despite his pleas that an extension be granted so that his counsel could complete outstanding discovery and try the case.   The defendants failed to appear for trial. There had been no preparation for the case, and there was procedural confusion because the Second Circuit had not yet ruled on the Writ of Mandamus.  *See supra* pp. 38-43.

(8)     The court pushed forward with the trial and the plaintiff's testimony, despite the protestations of defendants' counsel.   Defendants' counsel moved for a mistrial but the court ignored the request.    The court then made a pile of all of the plaintiff's documents and sorted out everything that was not on university letterhead.   The court made the surprise ruling that only documents on university letterhead would be admissible evidence; everything else was suppressed.   Both parties objected, and plaintiff moved for a mistrial.   The court was resolute however in clearing this case from its docket.   The court refused to hear any testimony from the defendants or the plaintiff's witnesses.   The court then told the parties they had rested, but admitted an additional document for the defendants at the last minute.   Plaintiff objected and said that this document was the basis of a fraud charge in one of the supplemental actions that the court had refused to consolidate or allow discovery upon.   The court allowed defendants' counsel to provide testimony on this document in his closing argument, even though there had been no prior evidence or testimony on this matter.   A controversy erupted where the plaintiff was pointing out that the court was trying a claim in another case (*Levin*), but the court told the plaintiff to be quiet, or he would be removed from the courtroom by the U.S. Marshal.   Defendants' counsel continued to testify on this document, more controversy erupted, and the plaintiff walked out of the courtroom.   The court told defendants' counsel to finish up.   Plaintiff walked back in and requested a side bar.   The jury heard the commotion over the document that had been introduced and knew that there were allegations of fraud connected with this document.    The court made the plaintiff give his rebuttal, amidst constant interruption from defendants' counsel.   *See supra* pp. 43-63.

(9)     The court then prepared charges for the jury, and told the parties that the reason two of the plaintiff's claims had been struck was because there was no evidence to support them.   Plaintiff objected and pointed out that the only reason there was no evidence to support these claims is because the court had arbitrarily suppressed 90% of the university's record which contained this necessary evidence. *See supra* pp. 76-85.

(10)     The court had failed or refused to amend/consolidate 32 related claims in this matter, so that all claims could be heard at once before one jury and in one trial. Instead the court only allowed 6% of the plaintiff's claims to go forward, and this was only announced at the last minute from the bench.   The judge never decided what to do with the remaining 94% of the claims that had been in his court, and which were assigned to other judges.   *See supra* pp. 145-147.

(11)     Moreover, throughout this trial, the judge continued to humiliate and belittle the plaintiff in front of the jury.   This undeserved treatment clearly prejudiced the plaintiff's claims and testimony in the eyes of the jury.   Moreover, the fact that plaintiff kept requesting the assistance of his counsel, and that the judge kept telling the plaintiff to "finish up" or "wrap up" further prejudiced and tainted the jury.   *See supra* pp. 86-90.

(12)    This trial was supposed to last 18 days, with over 45 witnesses and experts. Because this court had prematurely forced this trial before it was ready, it took 2 ½ days, with no witness and no experts from either side.   The total amount of testimony from the plaintiff was approximately 18-20 minutes, with defendants counsel constantly interrupting the testimony throughout.   Both parties had moved for a mistrial, and the court had even threatened to hold the plaintiff in contempt because he was objecting to the fundamental fairness of this proceeding.   In the end, the jury concluded that there had been no evidence presented for the plaintiff, and the verdict was handed to the defendants.   *See supra* 142-146.

(13)    At the conclusion of the trial, the court apologized for the "disjointed fashion in which this matter was presented" and admitted that "*we're all troubled here by trying to understand just what the evidence is in view of the way it's all been presented.*"   *See supra* pp. 90-91.

(14).    Unquestionably, the outcome of this case would have been much different if the court had allowed plaintiff's counsel to complete discovery and try the case, and to properly present the evidence to the jury, with 100% of the university's record in evidence, rather than 10%, and depositions and examination of over 45 witnesses and experts, rather than none.

(15)    Thereafter, the judge took more than a year to decide whether to grant the plaintiff's motion for a new trial, and refused to recuse himself from this case, or vacate this judgment as void.  *See supra* pp. 150-152.

168.    In light of the foregoing, the inevitable and final question that must be asked is whether the *Dittes* judgment is void for due process violations because the court denied the plaintiff an "*opportunity to be heard 'at a meaningful time and in a meaningful manner.*'"  *Matthews,* 424 U.S. at 333; *Armstrong*, 380 U.S. at 552; *Grannis*, 234 U.S. at 394.

## VII.    ARGUMENT IN SUPPORT OF VOIDNESS UNDER RULE 60(b)(4)

169.    As already noted above, it is well-settled law that "there is no time limit on an attack on a judgment as void."   Wright, Miller & Kane, § 2862.  A Rule 60(b)(4) motion to vacate a judgment as "void" may be brought "any time after final judgment."  *McLearn v. Cowen & Co.*, 660 F.2d 845, 848 (2d Cir. 1981) (citing *Crosby v. Bradstreet Co.*, 312 F.2d 483 (2d Cir. 1963), *cert denied*, 373 U.S. 911, 83 S.Ct. 1300 ((judgment vacated as void thirty years after entry);

*Parker, PPA v. Della Rocco*, 197 FRD 214, 215-216 (D.C. Conn. 2000) (two-year delay in seeking relief from void judgment is not unreasonable where "[c]ourts have been exceedingly lenient in defining the term 'reasonable time' with regard to voidness challenges") (quoting *Beller & Keller v. Tyler*, 120 F.3d 21, 24 (2d Cir. 1997).

170.    The instant Rule 60(b)(4) motion to vacate the judgment as "void" is timely for the following reasons:   (1) the final judgment in *Dittes* was entered on March 21, 2001; (2) the final judgment was timely appealed to the U.S. Court of Appeals for the Second Circuit[7]; (3) six months after the final judgment was entered in *Dittes*, on September 18, 2001, plaintiff filed an independent action (*President and Fellows*) to collaterally attack the voidness of the judgment in *Dittes;* (4) *President and Fellows* is still pending before this Court, and plaintiff has moved to amend his complaint to include the Rule 60(b)(4) arguments for voidness.  Therefore, since this action was brought within six months of the final judgment in *Dittes*, then this amendment relates back under F.R.Civ.P. 15(c), and it is well settled law that a Rule 60(b)(4) motion to vacate a judgment for voidness may be brought "any time after final judgment."   *McLearn,* 660 F.2d at 848; *Beller & Keller,* 120 F.3d at 24;  *Parker, PPA,* 197 FRD at 215-216; and *Crosby,*  312 F.2d at 483.

171.    Rule 60(b)(4) authorizes a court to "relieve a party or his legal representative from a final judgment, order, or proceeding . . . [where] the judgment is void."  A motion made under this part of the rule differs markedly from motions under other sections of Rule 60(b).  With a timely filed Rule 60(b)(4) motion, there is no question of 'discretion' on the part of the court.  "A void judgment is a legal nullity and a court considering a motion to vacate has no discretion in

---

[7]  This appeal was dismissed on the grounds that the plaintiff did not file pre-docketing Forms C and D,; but the Second Circuit expressly "waives" this requirement of filing Forms C and D for *pro se* appellants.   Therefore the Second Circuit's dismissal of *Dittes* appeal was erroneous, and the resulting order is not only "void," but also in violation of FRAP 47(b) ("No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local circuit rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement."

determining whether it should be set aside." *Jordan v. Gilligan*, 500 F.2d 701 (6th Cir. 1974) *cert denied*, 421 U.S. 991, 95 S.Ct. 1996.  Indeed, "if the underlying judgment is void, it is a *per se* abuse of discretion for a district court to deny a movant's motion to vacate the judgment under Rule 60(b)(4)." *Central Vermont Public Service Corp. v. Herbert*, 341 F.3d 186, 189 (2d Cir. 2003).

172.    Accordingly, a "judgment is not void merely because it is erroneous." *In re Texlan Corp.*, 596 F.2d 1092, 1099 (2d Cir. 1979).   It is void "only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law."   11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2862. Congress intended that Rule 60(b)(4) of the Federal Rules of Civil Procedure should relieve a party from a final judgment for 'voidness,' if a court "acted in a manner inconsistent with due process of law."  *Otte v. Manufacturers Hanover Commercial Corp.*, 596 F.2d 1092, 1099 (2d Cir. 1979) (quoting Wright & Miller); *Fustok v. Conticommodity Servs., Inc.* 873 F.2d 38, 39 (2d Cir. 1989) (same);  *Parker, PPA v. Della Rocco*, 197 FRD 214, 215-216 (D.C. Conn. 2000) ("A judgment is void under Rule 60(b) . . . if the court which rendered it . . . acted in a manner inconsistent with due process of law").

173.    As already noted above, the Supreme Court holds that "where an error of constitutional dimension occurs, a judgment may be vacated as void."  *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 374-78, 60 S.Ct. 317 (1940).   Accordingly, a constitutional error exists where a judgment is rendered "void" because the court entered it in "violation of due process." *Slack v, McDaniel*, 529 U.S. 473, 120 S.Ct. 1595 (2000).  The Supreme Court has defined this due process violation to be a denial of the fundamental "*opportunity to be heard 'at a meaningful time and in a meaningful manner.*'" *Mathews,* 424 U.S. at 333; *Armstrong,* 380 U.S. at 552; *Grannis,* 234 U.S. at 394.   And any court that "deprive[s] parties of substantive

rights" without providing them an opportunity to be heard at a meaningful time and in a meaningful manner shall be "regarded as a denial of the due process of law guaranteed by the Fourteenth Amendment."   *Shelly v. Kraemer*, 334 U.S. 1, 16, 68 S.Ct. 836 (1948); *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1878).

174.    In this case, as clearly set forth above, the *Dittes* Court deprived the plaintiff of substantive rights by denying meaningful discovery, amendments, representation by counsel, and the opportunity to be heard "at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893 (1976).   "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands." 424 U.S. at 333 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).   To this end, the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266,  98 S. Ct. 1042 (1978); *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961) (same).

175.    A "meaningful opportunity to be heard" requires that a party have "an opportunity to present evidence on the allegations of the complaint, as well as the contested factual issues," and the denial of this opportunity will render a court's judgment void.  *Klapprott v. United States*, 335 U.S. 601, 609, 93 L. Ed. 266, 69 S. Ct. 384 (1949) (holding that "if the hearing of evidence is a legal prerequisite to rendition of a valid" judgment, then the denial of this opportunity renders the judgment void).  "Due Process mandates that a judicial proceeding give all parties an opportunity to be heard on the critical and decisive allegations which go to the core of the parties' claim or defense and to present evidence on the contested facts."  *Thompson v. Madison County Bd. of Educ.,* 476

F.2d 676, 678 (5th Cir. 1973) (holding that "a court can only render a judgment after the parties have been afforded a full and fair trial on the claims properly before the court").

176.     In this case, the court denied the plaintiff "an opportunity to be heard on the critical and decisive allegations which go to the core of [his] claim[s] . . . and to present evidence on the contested facts." *Thompson,* 476 F.2d at 678; *Klapprott*, 335 U.S. at 609.     Indeed, throughout the entire trial, the court kept reprimanding the plaintiff as follows: "Go ahead, finish up sir." (2 Tr. 14:24); "There is no evidence, sir, you are just testifying in front of the jury," (2 Tr. 77:11-12);  "I ask you not to comment further or I'm going to have the marshal remove you from the room.  Now please be seated." (2 Tr. 94:11-13);  "Sir, I ask you to be seated."  (2 Tr. 97: 15); "Now please, I'm – sit sir.   And marshal, if he speaks up again, I'll ask to assist the gentlemen from the courtroom." (2 Tr. 97-98:1-2);  "You can't have additional testimony" (2 Tr. 97-98:1-2); "Wrap it up.   Finish it up, if you would."  (2 Tr. 97-98:1-2); "[W]e don't need any additional evidence, sir." (2 Tr. 97-98:1-2); "[W]e're simply trying to avoid getting any more evidence in."  (2 Tr. 121: 25-26:1-2); "Could you finish up, if you will sir."  (2 Tr. 122:5); "It is not something to bring up in front of the jury.  Would you wrap up, please sir."  (2 Tr. 122: 23);  "About done sir?" (2 Tr. 123:4).    Unquestionably, the court denied the plaintiff "an opportunity to be heard on the critical and decisive allegations which go to the core of [his] claim[s] . . . and to present evidence on the contested facts." *Thompson,* 476 F.2d at 678; *Klapprott*, 335 U.S. at 609.

177.     All of the foregoing adds up to the insurmountable conclusion that the plaintiff did not have an opportunity to be heard "at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333.    Ninety percent of the plaintiff's evidence had been arbitrarily suppressed at the last minute; the jury did not hear from a single witness; the court even refused to summons the defendants to appear for the trial, thus making it "impossible" for the defendants to be examined or

questioned at trial.  Cf. plaintiff's opening statement about the complete lack of witnesses and/or

defendants present for this trial:  "This is an impossible situation, Your Honor."  Tr. 11-15.

178.    Under Rule 60(b)(4), relief from a "void" judgment may be granted if a court "acted

in a manner inconsistent with due process of law."  *Otte v. Manufacturers Hanover Commercial*

*Corp.*, 596 F.2d 1092, 1099 (2d Cir. 1979) (quoting Wright & Miller, Federal Practice and

Procedure § 2872).   An "error of constitutional dimension" occurs, and the "judgment is void for

purposes of Rule 60(b)(4)"  if the judgment is "entered in violation of due process."  *Simer v. Rios*,

661 F.2d 655, 663 (7th Cir. 1981) *cert denied* 456 U.S. 917, 102 S.Ct. 1773; *Bass v. Hoagland*, 172

F.2d 205, 209 (5th Cir.), *cert. denied*, 338 U.S. 816, 70 S. Ct. 57 (1949) ("a judgment, whether in a

civil or criminal case, reached without due process of law is without jurisdiction and void . . .

because the United States is forbidden by the fundamental law to take either life, liberty or property

without due process of law, and its courts are included in this prohibition.").

179.    In *Powell v. Alabama*, the Supreme Court stated that "[i]t never has been doubted by

this court, or any other so far as we know,"  that the "opportunity" to be heard in a meaningful way

is a "preliminary step[] essential to the passing of an enforceable judgment" and constitutes a "basic

element[] of the constitutional requirement of due process of law."   287 U.S. at 68.   Not

surprisingly, the Supreme Court holds that the necessity of  an opportunity to be heard in a

meaningful way constitutes one of the "'immutable principles of justice which inhere in the very

idea of free government which no member of the Union may disregard.'"  *Id*.  As Justice Field put

it, the rule "that no one shall be personally bound until he has had his day in court [is] as old as the

law," and it means that an individual "must be afforded" a meaningful opportunity to be heard.  *Id*.

(citing *Galpin v. Page*, 18 Wall. 350, 368-369 (1873)).   In short, judgment without this opportunity

wants all the attributes of a "judicial usurpation and oppression, and never can be upheld where justice is justly administered."   287 U.S. at 69.

180.     The Supreme Court concluded with one of the bedrock principles of due process:

"What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel when desired and provided by the party asserting the right... . Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He is unfamiliar with the rules of evidence... He requires the guiding hand of counsel at every step in the proceeding.... If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."

287 U.S. 45, 68-69;  *In re Grand Jury Subpoena Served upon Doe*, 781 F.2d 238, 246 (2d Cir., 1986) (assistance of counsel is "of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions'."); *Chandler v. Fretag* 348 U.S. 3, 8 (1954) (denying a party  of any opportunity whatever to obtain counsel may deprive him of due process of law); *Hebert v. Louisiana*, 272 U.S. 312, 316, 71 L. Ed. 270, 47 S. Ct. 103 (1926) (same).

181.     Finally, if a judgment is "void," then a court considering a Rule 60(b)(4) motion to vacate "has *no discretion* in determining whether it should be set aside." *Jordan v. Gilligan*, 500 F.2d 701 (6th Cir. 1974) *cert denied*, 421 U.S. 991, 95 S.Ct. 1996 (emphasis added).   "[T]he judgment is either void or it is not." *Central Vermont Public Service Corp. v. Herbert*, 341 F.3d 186, 189 (2d Cir. 2003).   Indeed, "if the underlying judgment is void, it is a *per se* abuse of discretion for a district court to deny a movant's motion to vacate the judgment under Rule 60(b)(4)." *Id*. at 189.

## CONCLUSION:  RULE 60(b)

For all of the foregoing reasons, plaintiff's motion to vacate the final judgment in *Tibbetts v. Dittes* (01-7377), on the grounds that it is void because the *Dittes* Court "acted in a manner inconsistent with due process of law" should be granted pursuant to F.R.Civ.P. 60(b)(4).    The plaintiff's motion to vacate the judgment in Dittes should also be granted for "mistake" pursuant to Rule 60(b)(1) and "fraud" pursuant to Rule 60(b)(3).    "In simple English," Rule 60(b) should be liberally construed to vest "power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."    *Klapprott,* 335 U.S. at 614, 69 S.Ct. at 390. "Fair hearings are in accord with elemental concepts of justice, and the language of . . . clause of 60 (b) is broad enough to authorize the Court to set aside the default judgment and grant petitioner a fair hearing."  335 U.S. at 615.

## COUNT ONE:         FRAUD

182. Plaintiff hereby repleads and incorporates by reference each and every allegation set forth above, and farther states as follows:

183.    "The essential elements of an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury."  *Maturo v. Gerard*, 196 Conn. 584, 587-588 (Conn., 1985); *Paiva v. Vanech Heights Constr. Co.*, 159 Conn. 512, 515, 271 A.2d 69 (1970).  "Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways."  *Maturo*, 196 Conn. at 588; *Hathaway v. Bornmann*, 137 Conn. 322, 324, 77 A.2d  91 (1950).   And the jury as the "trier of facts is the judge of the credibility of the testimony and of the weight to be accorded it."  *See*

*DeLuca v. C. W. Blakeslee & Sons, Inc.*, 174 Conn. 535, 547, 391 A.2d 170 (1978); *Yale Univ. v. New Haven*, 169 Conn. 454, 463, 363 A.2d 1108 (1975).

184.    Plaintiff can set forth a prima facie cause of action for fraud against Defendant Yale University.    During the *Dittes* trial, (1) defendants' counsel made sixty-six (66) false representations about the plaintiff's student record at the university "as a statement of fact," (2) that these 66 statements were "untrue and known to be untrue by the party making it," (3) that these 66 statements were "made to induce [the jury] to act on it," and (4) that the jury "did so act on it to [the] injury" of the plaintiff.    *Maturo*, 196 Conn. at 587-588; *Paiva*, 159 Conn. at 515.

185.    The underling facts before the Court showing that defendants committed fraud are as follows:

(A).    On October 31, 1992, the University convened an administrative hearing of the Professional Studies Committee ("PSC"), to determine quasi-criminal charges against the plaintiff.

(B)    In so doing, the University was obligated to follow the University's internal Disciplinary Committee Rules (hereinafter "DC Rules").  *See* Admitted Evidence 108-110.

(C)    At all material times hereto, the University violated DC Rules 4(a), 4(d), 4(e) and 4(g) by *inter alia*:

    (1)    withholding and suppressing plaintiff's exculpatory evidence obtained from U.S. Naval Investigative Service Command (NISCOM) and retired questioned document examiners from both the Federal Bureau of Investigation (FBI) and the U.S. Secret Service (hereinafter "exculpatory evidence"), in violation of DC Rule4(a)

    (2)    failing to "verify the facts" or "interview the people involved," in violation of DC Rule 4(d);

    (3)    refusing to allow plaintiff's witnesses to testify, in violation of DC Rule 4(e); and

      (4)      refusing to allow plaintiff representation by an attorney for "potential" criminal charges, in violation of DC Rule 4(g).

186.    Despite these blatant violations, which prejudicially influenced the PSC members against the plaintiff, the University still voted and exonerated the plaintiff from the charges-- but only by a 'vote of 3-to-2 (hereinafter the "PSC Minutes").

187.    Had the University followed the DC Rules and allowed all of the plaintiff's evidence and witness testimony to considered and admitted, the PSC vote would have been 5-to-0.

188.    In February 1995, the University expunged the PSC Minutes from the plaintiffs educational record because it was deemed "misleading" and "inaccurate" under FERPA. 20 U.S.C. § 1232(g)(a)(2) and 34 C.F.R. § 99 *et seq*.

189.    Nevertheless, at trial, defendants' counsel introduced its only exhibit--the PSC Minutes—without telling the jury that these PSC Minutes had been expunged from the plaintiff's record under FERPA. 34 CFR § 99.2 l(c)(2).

190.    In so doing, defendants knowingly misled the jury and tainted the evidence to be considered by the jury.

191.    Defendants next misled the jury with 66 representations that the university had somehow "responsibly" handled these charges, when, in fact, the university recklessly and grossly violated DC Rules 4(a), 4(d), 4(e) and 4(g).

192.    Defendants also committed fraud and misled the jury by:

(1)      deliberately suppressing evidence of the truth of what really occurred in the University's PSC hearing of October 31, 1991;

(2)      deliberately creating innuendos in the minds of the jury that the plaintiff may have submitted "falsified" and "phony" affidavits to the University, when, at all times, defendants knew that there was no such evidence to support these charges;

(3)      deliberately insinuating that the plaintiff may have been responsible for a "signature discrepancy" on the notarized affidavit of Russell J. Raymond, when, at all times,

defendants knew this "signature discrepancy" had been innocently caused by the mother of Russell Raymond;

(4)     deliberately suppressing the introduction of plaintiff's exculpatory evidence from NISCOM and the questioned document examiners to explain the truth of Russell J. Raymond's "signature discrepancy" to the jury;

(5)     deliberately suppressing testimony from the plaintiff that the university had failed to properly conduct an investigation of the aforesaid charges through campus, state or federal law enforcement authorities;

(6)     deliberately suppressing plaintiffs testimony that the university had refused to permit an attorney to represent during the hearing of the aforesaid quasi-criminal charges; and

(7)     deliberately misleading the jury on the law of defamation by claiming the university had a "right" to bring said charges, when, at all material times hereto, the university failed to investigate these charges because they knew them to be false, malicious and without merit.

193.     In short, Defendants' 66 representations to the jury and the court were permeated with fraud, grossly perverted the truth, and obstructed the proper administration of justice.

194.     Defendants Yale, Wiggin & Dana, and Doyle knowingly and willfully made the above misrepresentations with the intent of misleading the jury and the Court.

195.     These misrepresentations were made with the implied, if not express, authority of the PRESIDENT AND FELLOWS OF YALE, and each of them

196.     The jury and court reasonably relied on these misrepresentations.

197.     Plaintiff was damaged by the misrepresentations because, among other things, it tainted and prejudiced the jury as to the truth of plaintiff's claims, and as a result, plaintiff was not able to prove his otherwise meritorious claims at trial.

198.     Plaintiff has been damaged in the amount of the original relief requested in *Dittes,* plus the intervening five years to resolve this fraud and obtain relief, to include interest, costs and damages upon the original amount.

199.    Plaintiff also requests the award of punitive damages.   *See Bailey Employment Sys., Inc. v. Hahn*, 545 F. Sup. 62, 73 (D. Conn. 1982), *aff'd*, 723 F.2d 895 (2d Cir. 1983).   "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Collens v. New Canaan Water Co.*, 155 Conn. 477, 489, 234 A.2d 825 (1967).   In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of a wanton violation of a person's rights, a malicious injury, or an evil motive. *Triangle Sheet Metal Works, Inc. v. Silver*, 154 Conn. 116, 128, 222 A.2d 220 (1966); *Venturi v. Savitt, Inc.*, 191 Conn. 588, 592, 468 A.2d 933 (1983).

200.    In this case, defendant's conduct in misrepresenting the accuracy and contents of the university's records was intentional and knowing and with a reckless indifference to the plaintiff's rights.   And plaintiff was clearly injured from the defendants' blatant misrepresentations.   Thus plaintiff satisfies the basic requirements, as set forth above, which justifies the award of punitive damages. *Gargano v. Heyman*, 203 Conn. 616, 622 (Conn., 1987).

## COUNT TWO:        NEGLIGENT MISREPRESENTATION

201.    Plaintiff hereby repleads and incorporates by reference each and every allegation set forth above, with specific reference to Count One, and further states as follows:

202.    The elements of negligent misrepresentation are (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known of its falsity; (3) with intent to induce another to act on it; and (4) which results in a party acting in justifiable reliance on the misrepresentation. *Clark v. Haggard*, 141 Conn. 668, 109 A.2d 358 (1954); *Warman v. Delaney*, 148 Conn. 469, 172 A.2d 188 (1961).

203.    The Connecticut Supreme Court has held that:  "A fraudulent representation in law is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the

purpose of inducing action upon it." *Clark*, 141 Conn. at 672-673 (quoting *Sallies v. Johnson*, 85 Conn. 77, 82, 81 A. 974 (1911).

204.    "In matters susceptible of actual knowledge, if the party who has and is known to have the best means of knowledge, makes an affirmation contrary to the truth, in order to secure some benefit to himself, the law treats him as stating that he knows that whereof he affirms, and so as guilty of a fraud, although he spoke in ignorance of the facts; because he asserts that he knows what he does not know." *Scholfield Gear & Pulley Co. v. Scholfield*, 71 Conn. 1, 19, 40 A. 1046; *Dwyer v. Redmond*, 103 Conn. 237, 244, 130 A. 108; *Water Commissioners v. Robbins*, 82 Conn. 623, 644, 74 A. 938; *O'Neill v. Conway,* 88 Conn. 651, 653,  92 A. 425; *E. & F. Constr. Co. v. Stamford*, 114 Conn. 250, 259, 158 A. 551.

205.    In this case, defendants Yale, Wiggin & Dana, and Doyle are liable for "negligent misrepresentation" because (1) they made 66 material misrepresentations of the university's record to the jury, (2) they made these misrepresentations under circumstances in which they ought to have know its falsity, (3) with intent to induce the jury to act upon it; and (4) which resulted in the jury acting in justifiable reliance on the 66 misrepresentations regarding the content of the university's records.  *Clark*, 141 Conn. 668; *Warman,* 148 Conn. 469.

206.    Plaintiff was damaged by the defendants' misrepresentations because, among other things, it tainted and prejudiced the jury as to the truth of plaintiff's claims, substantially misrepresented the contents of the university's records, and as a result, plaintiff was unable to prove his otherwise meritorious claims at trial.

207.    Plaintiff has been damaged in the amount of the original relief requested in *Dittes,* plus the intervening five years to resolve this fraud and obtain relief, to include interests, costs and punitive damages.

## COUNT THREE:    MALICIOUS DEFENSE (C.G.S. § 52-568)

208.    Plaintiff hereby repleads and incorporates by reference each and every allegation set forth above, and further states as follows:

209.    Defendants, and each of them, are individual entities, specially chartered corporations, or limited liability companies existing under Connecticut law, and as such, are "persons" within the meaning of C.G.S. § 52-568(a).

210.    For five years, Defendants asserted defenses without a good faith basis in fact or law.

211.    For five years, Defendants used dilatory litigation tactics and sought to obstruct discovery and evidence of the truth of plaintiff's claims.

212.    At trial, the University Defendants failed to appear, obstructed the plaintiff's proper evidence, suppressed the plaintiff's testimony, and made deliberate material misrepresentations to mislead the jury and court, as more fully set forth above.

213.    At all material times hereto, defendants did not have a good faith basis in any defense, as evidenced by the aforesaid fraud and misrepresentations made by the defendants to the jury and court.

214.    For five years, defendants asserted defenses without a good faith basis and with a malicious intent to unjustly vex and trouble a pro se plaintiff and obstruct the truth of his claims.

215.    Defendants' five year malicious conduct in using dilatory litigation tactics and deliberate misrepresentations with the intent to deceive the jury and court constitutes fraud and a violation of C.G.S. § 52-568.

216.    As direct result of defendants' malicious defense in the underlying litigation, plaintiff is entitled to double damages for a showing of lack of good faith or probable cause in the

defenses, or treble damages for showing Defendants' malicious intent to unjustly vex and trouble the plaintiff.

### INJUNCTIVE RELIEF:  SEAL RECORD FROM TRIAL WHICH CONTAINED PREVIOUSLY EXPUNGED MATERIAL UNDER FERPA  (20 U.S.C. § 1232 (g); 34 C.F.R. § 99)

217.    Plaintiff hereby repleads and incorporates by reference each and every allegation set forth above, and further states as follows:

218.    Plaintiff has a privacy right in his educational record.

219.    Defendants have acknowledged that right and have also acknowledged the misleading nature of this record, which the University expunged under FERPA.

220.    This case has no historical significance and there are no other public benefits to weigh against the significant prejudice to plaintiff of maintaining a public record that is misleading, inaccurate and injurious to good name and reputation.

221.    It is especially injurious to plaintiff to permit public access to the record in this case, in which he was prevented through no fault of his own from presenting his own countervailing evidence and claims by competent counsel.

222.    Justice requires that a protective order be entered to protect the plaintiff from the annoyance, embarrassment, and oppression of the defendants' reintroduction of "inaccurate" and "misleading" records into the public record, which had previously been completely expunged, as if they were non-existent, under FERPA.

## **PRAYER FOR RELIEF**

WHEREFORE, to the extent not inconsistent with the parties' right to appeal, or other - remedies in connection with this action, the Plaintiff having set forth the equitable grounds of fraud, prejudicial unfairness, and surprise in support of relief from the underlying judgment, Plaintiff respectfully prays that this Court:

(1).    Set aside the judgment entered in *Tibbetts v. Dittes* (395CV00995AVC) pursuant to F.R.Civ.P. 60(b);

(2).    Grant a trial on the merits of all claims so triable;

(3).    Award costs, interests and punitive damages for defendants' willful and reckless misrepresentations, plus attorney's fees and costs under Title 28 U.S.C. § 1927 and C.G.S. § 52-568.

(4).    Enter a protective order sealing the record in Dittes and denying public access to the plaintiff's expunged educational record;

(5).    And provide such other relief as the Court deems just and necessary.

Respectfully submitted,

_____
Jeffrey L. Tibbetts
1021 Arlington Blvd., #822
Arlington, VA  22209
(703) 625-8718

## CERTIFICATION FOR A VERIFIED COMPLAINT

I affirm under penalty of perjury, pursuant to 18 USC § 1621, 1623, that all of the facts and allegations contained herein are true and accurate to the best of my knowledge and belief

_____
Jeffrey L. Tibbetts

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this ___ day of February, 2005, a true and correct copy of the foregoing was sent under agreement by electronic transmission to defendants' counsel of record:

Jeffrey Babbin
Wiggin & Dana
P.O. Box 1832
New Haven, CT  06508-1832

_____
Jeffrey L. Tibbetts